John **GEORGOPOULOS** and Paul **Auriemma**, Plaintiffs,

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AFL–CIO, Defendant.**

No. 95 Civ. 5145 (DNE).

United States District Court,
S.D. New York.

Oct. 7, 1996.

---

Lewis, Greenwald, Clifton & Lewis, P.C.,
New York City (Daniel E. Clifton, of counsel), for plaintiffs.

Cohen, Weiss and Simon, New York City (Richard M. Seltzer and Nathaniel K. Charney, of counsel), for defendant.

## OPINION & ORDER

EDELSTEIN, District Judge:

Currently pending before the Court are cross motions for summary judgment, pursuant to Federal Rule of Civil Procedure ("Rule") 56. These motions are brought respectively by plaintiffs John Georgopoulos ("Georgopoulos") and Paul Auriemma ("Auriemma") ("plaintiffs"), and defendant the International Brotherhood of Teamsters ("IBT"). For the reasons discussed below, plaintiffs' motion is denied, defendant's motion is granted, and plaintiffs' Amended Complaint is dismissed in its entirety.

## BACKGROUND

This opinion emanates from the voluntary settlement of an action commenced by the Government against the IBT and the IBT's General Executive Board. This settlement was embodied in the voluntary consent order entered March 14, 1989 ("the Consent Decree"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through a two-phased implementation of the Consent Decree's various remedial provisions. In the first phase of the Consent Decree, these provisions provided for three court-appointed officers: the Independent Administrator to oversee the Consent Decree's provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to supervise the electoral process that led up to and included the 1991 election for International Union Office. In the second phase of the Consent Decree, the Independent Administrator was replaced by a three-member Independent Review Board ("the IRB").

During its more than seven-year history, the Consent Decree has spawned a tremendous amount of litigation that has required this Court to issue numerous opinions. In one of those opinions, pursuant to this Court's authority under the All Writs Act, 28 U.S.C. § 1651(a), this Court enjoined "all local unions, joint councils, area conferences, and other entities subordinate to or affiliated

with the IBT, and any members, officers, representatives, agents and employees of the IBT or any such IBT affiliated entity, from filing or taking any legal action that challenges, impedes, seeks review of or relief from, or seeks to prevent or delay any act of any of the court officers appointed by this Court pursuant to the Consent Order in this action, in any court or forum in any jurisdiction except this Court[.]" December 15, 1989, Order at 3; *see also United States v. International Bhd. of Teamsters,* 728 F.Supp. 1032 (S.D.N.Y.), *modification denied,* 735 F.Supp. 502 (S.D.N.Y.), *aff'd,* 907 F.2d 277 (2d. Cir.1990).

The instant case involves the disposition of internal union disciplinary charges against plaintiffs. Plaintiff Georgopoulos was a member and President of Local Union 138 of the IBT ("Local 138" or "the Local"), located in Long Island City, New York. (First Amended Complaint, *Georgopoulos v. International Bhd. of Teamsters,* 95 Civ. 5145 ("Amended Complaint"), at 2–3 (Aug. 1, 1995).) Plaintiff Auriemma also was a member of Local 138, as well as its Secretary–Treasurer. *Id.* at 2–3. Defendant IBT is a labor organization with which Local 138 is affiliated. *Id.* Plaintiffs claim that they were subjected to discipline by the IBT without the due process required under Section 101(a)(5) of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(5), and seek to void the discipline imposed upon them by the IBT. *Id.* at 1.

On July 16, 1993, the IRB submitted "Proposed Charges Against Local 138 Officers John Georgopoulos and Paul Auriemma" to the General Executive Board of the IBT ("GEB"). (Independent Review Board, Proposed Charges Against Local 138 Officers John Georgopoulos and Paul Auriemma ("IRB Report"), at 1 (July 16, 1993).) In this report, the IRB detailed the results of an investigation regarding wrongdoing by Georgopoulos and Auriemma, and recommended that charges be brought against each. The IRB recommended that Auriemma be charged as follows:

While the Secretary Treasurer of Local 138, you brought reproach upon the IBT,

violated your fiduciary duties and engaged in an embezzlement scheme to defraud the IBT of out-of-work benefits in violation of Article II, Section 2(a) and Article XIX, Section 7(b)(1), (2) and (3) [of the IBT Constitution] *to wit:*

During the White Rose strike, you submitted forged members' signatures on the IBT's out-of-work benefit forms to the International and caused to be distributed out-of-work benefits in violation of specific provisions of the IBT Constitution and the IBT Secretary Treasurers Manual. By forwarding the out-of-work benefit forms containing forged signatures to the IBT, you represented to the IBT that these members were eligible to receive benefits when, pursuant to the IBT Constitution and the IBT Secretary Treasurers Manual, they were not entitled to benefits. Furthermore, not all members whom you represented to the International had received benefits actually received their out-of-work benefits. By this conduct, you engaged in an embezzlement scheme which defrauded the International of out-of-work benefits.

While Secretary Treasurer of IBT Local 138 you brought reproach upon the IBT, violated your fiduciary duties and your oath of office, failed to follow a bookkeeping system as prescribed by the IBT General Secretary Treasurer, and failed to require out-of-work members during the White Rose strike to personally sign the IBT's out-of-work benefit form in violation of Article II, Section 2(a), Article XII, Section 16(c), Article XXIII, Section 4 and Article XIX, Section 7(b)(1) and (2) of the IBT Constitution and Section 8.73(5) of the Manual for Local Union Secretary–Treasurers *to wit:*

During the White Rose strike, you knowingly permitted the forgery of members' signatures on the IBT's weekly out-of-work benefit forms, which were then submitted to the International. You also permitted members to collect out-of-work benefits without personally signing the out-of-work benefits form as required by the IBT Constitution and the IBT Secretary Treasurers Manual.

*Id.* at 24–26. The IRB recommended that Georgopoulos be charged as follows:

While the President of Local 138, you brought reproach upon the IBT, violated your fiduciary duties and engaged in an embezzlement scheme to defraud the IBT of out-of-work benefits in violation of Article II, Section 2(a) and Article XIX, Section 7(b)(1), (2) and (3) [of the IBT Constitution] *to wit:*

During the White Rose strike, you schemed with others to have forged members' signatures on the IBT's out-of-work benefit forms submitted to the International and caused out-of-work benefits to be distributed in violation of specific provisions of the IBT Constitution and the Secretary Treasurers Manual. By forwarding the out-of-work benefit forms containing forged signatures to the International, you and your co-schemers represented to the International that these members were eligible to receive benefits when, pursuant to the IBT Constitution and the IBT Secretary Treasurers Manual, they were not entitled to benefits. Furthermore, not all members whom you and your co-schemers represented to the International had received benefits actually received their out-of-work benefits. By this conduct, you engaged in an embezzlement scheme which defrauded the International of out-of-work benefits.

While the President and principal officer of IBT Local 138 you brought reproach upon the IBT, violated your fiduciary duties and your oath of office, failed to require out-of-work members during the White Rose strike to personally sign the IBT's out-of-work benefit form in violation of Article II, Section 2(a), Article XII, Section 16(c), and Article XIX, Section 7(b)(1) and (2) of the IBT Constitution and Section 8.73(5) of the Manual for Local Union Secretary–Treasurers *to wit:*

During the White Rose strike, you conspired with others to submit forged members' signatures on the IBT's weekly out-of-work benefit forms to the International and to distribute out-of-work benefits in violation of the International's requirement

that all recipients personally sign the out-of-work benefits form. *Id.* at 26–27.

The IRB advised the GEB that it "had sixty days within which to hold a hearing and to forward a final written report to the IRB." (Letter from John J. Cronin, Jr., Administrator of the IRB, to the Members of the General Executive Board of the International Brotherhood of Teamsters (July 16, 1993).) The IBT then referred the charges against Georgopoulos and Auriemma to the Ethical Practices Committee of the IBT ("EPC") for further action.

The EPC was established and operates pursuant to the authority granted to the IBT General President by Article XIX, Section 11 of the IBT Constitution. IBT Const. art. XIX, § 11; International Brotherhood of Teamsters Ethical Practices Committee Rules and Procedures ("EPC Rules"), ¶ 1(a). It consists of an Administrator and fifteen members who comprise five three-person regional hearing panels. EPC Rules, ¶ 1(b). The EPC exists "[f]or the purpose of ensuring the high moral and ethical standards in the administrative and operative practices of the International Union and its subordinate bodies, and to further strengthen the democratic processes and appeal procedures within the Union as they affect the rights and privileges of individual members or subordinate bodies...." IBT Const. art. XIX, § 14(a). Pursuant to the EPC Rules, in cases where the EPC Administrator finds a basis for exercising jurisdiction over disciplinary charges and referring them to an EPC panel, the Administrator must draw up a Specification of Charges setting forth the disciplinary charges against the individuals involved. EPC Rules, ¶¶ 5(a)(i), 5(d).

By letter dated August 20, 1993, EPC Administrator Aaron Belk determined that the IRB's proposed charges against Georgopoulos and Auriemma "involve serious allegations of financial impropriety, and therefore merit EPC jurisdiction." (Letter from Aaron Belk, International Vice President and EPC Administrator, to Tom Gilmartin, Jr., Eastern Conference of Teamsters Ethical Practices Committee Panel ("Belk Letter"), at 1 (Aug. 20, 1993).) Accordingly, the EPC Administrator issued a Specification of Charges as follows:

1. Local 138 President John Georgopoulos and Secretary–Treasurer Paul Auriemma allegedly violated the International Constitution and the Manual for Local Union Secretary–Treasurers by not requiring each out of work member to personally sign the out-of-work benefits form ("OWB forms") provided by the International for the benefits received during the White Rose strike, and by knowingly submitting forged signatures on the OWB Forms.

2. Brother Georgopoulos and Brother Auriemma allegedly engaged in an embezzlement scheme by which the International was defrauded into paying out-of-work benefits that it would not have otherwise paid. Brothers Georgopoulos and Auriemma allegedly executed this embezzlement through causing the International to send money each week for distribution of strike benefits as a result of forged signatures submitted to the International.

*Id.* at 2. Plaintiffs received a copy of this letter and the Specification of Charges. *Id.* at 3. The EPC panel to which this matter was referred scheduled a hearing on these specifications for September 10, 1993 ("the September EPC hearing"). On August 30, 1993, the EPC provided Georgopoulos and Auriemma written notice of this hearing, and further advised them "to bring to this hearing any information ... and witnesses that you wish to submit to the E.P.C. panel." (Letter from Tom Gilmartin, IBT Vice President, to John Georgopoulos and John Auriemma (Aug. 30, 1993) ("August 30, 1993 Gilmartin Letter").)

At the September EPC hearing, the EPC Administrator introduced as exhibits the IRB Report and supporting documentation. (Transcript, International Brotherhood of Teamsters Ethical Practices Committee, Investigation re: Local 138 ("Tr."), at 3.) Both Georgopoulos and Auriemma appeared at the hearing, testified, called witnesses, introduced documents, and made opening and closing statements. *See generally id.* During the hearing, Georgopoulos and Auriemma each admitted that out-of-work benefits were distributed to Local 138 members in violation

of both the IBT Constitution and the Secretary–Treasurers Manual. *Id.* at 45–49; 99. Each man also admitted knowing that: (1) persons other than the named recipients of benefits signed the IBT's out-of-work benefit forms, in direct violation of the IBT Constitution; and (2) that out-of-work benefits were distributed to individuals other than named beneficiaries. *Id.* at 22–23; 90–98; 123–27; 135–37; 145–54. Georgopoulos and Auriemma each defended his conduct by claiming that the violations of the IBT's out-of-work benefit procedures has been necessary in their judgment to keep strikers on the picket line and to sustain the White Rose strike. *Id.* at 21–24; 45–48; 52–55; 123–24; 141–48. Plaintiffs further asserted that the individuals whose names were forged on the benefit forms actually received the benefits, and that in plaintiffs' view, plaintiffs' actions did not constitute embezzlement. *Id.* at 22–23; 56–58; 89–90; 124–25; 188; 223–24.

Following the September EPC hearing, the EPC panel asked the office of the IBT General Secretary–Treasurer to compare the out-of-work benefit forms from the White Rose strike with Local 138's tax reports of out-of-work benefits paid to members in 1991 and 1992 in order to determine the existence of discrepancies between the two. (Declaration of David Neigus, Counsel to the IBT Ethical Practices Committee, *Georgopoulos v. International Bhd. of Teamsters,* 96 Civ. 5145 ("Neigus Decl."), ¶ 22 (April 1995)); (Amended Complaint at 5–6.)

Based upon this comparison, the Secretary–Treasurer's office discovered discrepancies between the out-of-work benefit forms from the White Rose strike and the IRS forms prepared by Local 138. (Neigus Decl. ¶ 22.) As a result of this discovery, the Secretary–Treasurer's office prepared schedules showing the discrepancies, and the EPC scheduled a second day of hearings on this matter for April 6, 1994 ("the April EPC hearing"). *Id.* The EPC requested the attendance of fifteen Local 138 members whose tax forms under-reported by more than $1,000 the out-of-work benefits actually distributed to them by the International. *Id.* The EPC panel also asked that persons in the IBT General Secretary–Treasurer's of-

fice having direct knowledge of the Local 138 investigation be available to testify in person or by telephone. *Id.*

At the April EPC hearing, two witnesses testified via telephone—Richard Bell, Administrative Assistant to the IBT General Secretary–Treasurer ("Bell"), and Theresa Bailor, an employee in the Secretary–Treasurer's office familiar with the Local 138 investigation ("Bailor"). (Tr. at 265–94); (Amended Complaint at 6.) Bell and Bailor each advised the EPC panel about IBT's general out-of-work benefit procedures, and specifically described their preparation of the schedules that set forth the discrepancies between the IBT's benefit records and Local 138's tax filings. (Tr. at 265–94.) Georgopoulos and Auriemma were given the opportunity to question both Bell and Bailor. *Id.* at 290–94. Copies of the schedules prepared by the Secretary–Treasurer's office were made part of the hearing record, as was correspondence between the General Secretary–Treasurer and the charged parties concerning these schedules. *Id.* at 307–09.

Also during the April EPC hearing, Auriemma advised the EPC that the General Secretary–Treasurers office had sent questionnaires to individual Local 138 strikers concerning the financial discrepancies uncovered by the Local 138 investigation ("the EPC questionnaires" or "the questionnaires"). *Id.* at 321. Neither plaintiffs nor the EPC Administrator, however, sought to enter the questionnaires or the responses to the questionnaires part of the hearing record. (Neigus Decl. ¶¶ 24–25); (Amended Complaint at 6); *see generally* (Tr.) Moreover, neither Georgopoulos nor Auriemma questioned Bell or Bailor about the information contained in the responses to the questionnaires. (Tr. at 290–94.) Except for the fact that these questionnaires were sent to Local 138 strikers, *id.* at 321, the EPC Panel neither heard testimony regarding the EPC questionnaires or their responses, nor reviewed the EPC questionnaires or their responses. *See generally id.;* (Affidavit of John Georgopoulos, *Georgopoulos v. International Bhd. of Teamsters,* 95 Civ. 5145 ("Georgopoulos Affidavit"), ¶ 43).

On or about April 9, 1994, the EPC Panel submitted to the IBT General President the Final Report of its findings and recommendations on the charges against Georgopoulos and Auriemma. (Ethical Practices Committee Panel of the Eastern Conference of Teamsters, Final Report, *Findings and Recommendations on the Charges Against Local Union 138 Officers John Georgopoulos and Paul Auriemma* ("EPC Final Report") (April 9, 1994).) In the EPC Final Report, a unanimous panel concurred with the IRB charges against Georgopoulos and Auriemma, and concluded that

> Auriemma and Georgopoulos knowingly violated the provisions of the IBT Constitution and the IBT Secretary Treasurers Manual pertaining to the distribution of out-of-work benefits in that they permitted OWB payments to be distributed to striking members who did not qualify for those benefits; that they deceived the IBT by submitting signatures purporting to be those of striking members in order to have benefits issued to members who did not satisfy the procedural requirements for receiving those benefits; that they permitted the mishandling of the benefits in that the chain of custody of large amounts of cash was not maintained; and that they ignored proscribed record keeping rules designed to ensure the proper distribution of out-of-work benefits.

*Id.* at 3.

The EPC continued, however, that based upon its examination of the evidence adduced at Georgopoulos' and Auriemma's hearing, that the EPC was

> convinced that there was no plot to embezzle, and that all the benefits distributed during the strike did in fact end up in the possession of the intended beneficiaries. We draw this conclusion not only from the absence of credible evidence showing that members did not actually receive their money, but also from our conviction. having observed Auriemma and Georgopoulos in the course of two days of testimony, that they are telling the truth about what happened.

*Id.* at 4. The panel added that "the conflicts between the IBT's OWB records and the Local 138's payout records are purely bookkeeping errors, and not evidence of any malfeasance." *Id.* at 10. Accordingly, as a penalty for their actions, the EPC Panel recommended only that Georgopoulos and Auriemma be sanctioned in writing. *Id.* at 11. The EPC noted, however, that its "recommendation here would be different if [it] believed that there was any dishonesty, personal gain or enrichment involved in this case." *Id.* at 8–9.

As required by the EPC Rules, the EPC panel submitted its Final Report to the IBT General President. EPC Rules, ¶ 7(a). In accordance with the EPC Rules, on April 11, 1994, the IBT General President issued his decision regarding the EPC Final Report. (Decision of Ron Carey, General President ("Carey Decision") (April 11, 1994).) In this decision, the General President adopted the EPC's finding that there was insufficient evidence to sustain charges of embezzlement against Georgopoulos and Auriemma, stating that "the evidence simply does not show that Brother Auriemma or Brother Georgopoulos either participated in or knew about any schemes to deprive members of out-of-work benefits." *Id.* at 1. He rejected, however, the EPC's recommendation regarding the sanctions that should be imposed upon Georgopoulos and Auriemma for their misconduct, and imposed upon both consecutive "six[-]month suspension[s] from holding any elective or appointive position with the IBT or any IBT affiliate." *Id.* at 2. The General President explained his decision:

> I cannot ... abide by the recommendation of the EPC Panel that I condone serious violations of the IBT Constitution. The Panel's sympathy, or my own for that matter, for the plight of Local 138 during the White Rose strike, and our unanimous condemnation of union brothers who ignored the pickets of their fellow Teamsters, is largely irrelevant to the difficult decision I must render in this case. I am personally aware of the tremendous hardship borne by members of Local 138 on account of the reprehensible and lawless actions of White Rose which gave rise to the strike and prevented fair and just settlement. Nonetheless, as General Presi-

dent, I have a duty to enforce the Constitution of this Union.

As the Panel correctly observ[ed], adherence to the International Constitution is particularly important during times of crisis. I simply cannot permit local union officers to abandon the Constitution whenever hardship strikes. The laws set forth in the International Constitution are our guideposts for negotiating crisis. The Constitution must be followed even when the most emergent situation suggests a more expedient course.

*Id.*

On July 7, 1994, the IRB notified the General President that his April 11, 1994 decision concerning Georgopoulos and Auriemma was "inadequate because it did not properly address the IRB's proposed charge that Georgopoulos and Auriemma embezzled funds from the IBT through the intentional submission of forged signatures in order to obtain out-of-work benefits which would not otherwise have been released." (Letter from the Independent Review Board of the International Brotherhood of Teamsters to Ronald Carey, General President of the International Brotherhood of Teamsters ("IRB Letter"), at 1 (July 7, 1994).) The IRB continued that "the facts found by the [EPC] established the IRB's proposed embezzlement charge," *id.* at 1, because the Panel's "factual findings established that Georgopoulos and Auriemma had the fraudulent intent to embezzle funds from the IBT when they submitted forged signatures to the IBT each week in order to continue the flow of out-of-work benefits." *Id.* at 2. The IRB noted that under relevant Second Circuit case law, "[t]he intentional violation of IBT rules gives rise to an inference of the fraudulent intent to embezzle," and that "a finding of personal enrichment was not an element of the IRB's proposed embezzlement charge . . . ." *Id.*

Accordingly, the IRB "recommended that a decision be issued finding that Georgopoulos and Auriemma embezzled funds from the IBT through the weekly submission of forged signatures." *Id.* at 1. The IRB further informed the General President that "appropriate sanctions should be imposed on Georgopoulos and Auriemma," *id.*, specifically that

the appropriate sanction for Georgopoulos is a suspension from all IBT positions, including IBT membership, for a period of nine months. Based upon Auriemma's day-to-day involvement in the forgery of signatures and his submission of forged documents to the IBT, it appears that the appropriate sanction for Auriemma is a suspension from all IBT positions, including IBT membership, for one year.

*Id.* at 4. The IRB notified the General President that, pursuant to relevant IRB Rules, he "must file an affidavit with the IRB setting forth any and all additional actions that have been taken or will be taken to correct the deficiencies described in [its letter]." *Id.*

In response to the IRB's letter, on August 10, 1994, the General President modified his April 11, 1994 decision. (Letter from Ron Carey, General President of the International Brotherhood of Teamsters, to George [sic] Georgopoulos and Paul Auriemma (Aug. 10, 1994).) Specifically, the General President: (1) found that the EPC's "factual findings constitute embezzlement," *id.* at 1; (2) imposed a nine month suspension from all IBT positions, including membership, on Georgopoulos, *id.* at 1–2; and (3) imposed a one year suspension from all IBT positions, including membership, on Auriemma. *Id.* at 2.

On August 18, 1994, Georgopoulos and Auriemma appealed the General President's decision to the GEB. (Letter from John Georgopoulos and Paul Auriemma to Tom Sever, General Secretary–Treasurer of the International Brotherhood of Teamsters (Aug. 18, 1994).) They claimed that: (1) the finding that they committed embezzlement was erroneous; (2) they were deprived of due process; and (3) that the penalties imposed upon them were unduly harsh. (Letter from John Georgopoulos and Paul Auriemma to Ron Carey, General President of the International Brotherhood of Teamsters (Aug. 18, 1994).) In addition, they requested a stay of their penalties pending the GEB appeal, and asked that the their suspensions be served consecutively instead of concurrently. *Id.*

The IBT's Legal Department wrote to the IRB to "clarify the date and method of

[plaintiffs'] suspension." (Letter from Mary Joyce Carlson, Legal Department of the International Brotherhood of Teamsters, to John Cronin, Independent Review Board (Aug. 30, 1996).) The IRB responded that Georgopoulos' and Auriemma's suspensions should commence on September 15, 1994, and that "it is not acceptable to the IRB that the suspensions be served consecutively or in a staggered manner." (Letter from John J. Cronin, Administrator of the Independent Review Board, to Ron Carey, General President of the International Brotherhood of Teamsters (Sept. 12, 1994).) On September 13, 1995, the General President denied Georgopoulos' and Auriemma's request for a stay and advised them that their suspensions could not be served consecutively. (Letter from Ron Carey, General President of the International Brotherhood of Teamsters, to John Georgopoulos and Paul Auriemma (Sept. 13, 1994).)

Both Georgopoulos and Auriemma began serving their suspensions in September 1994. (Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment, *Georgopoulos v. International Bhd. of Teamsters,* 95 Civ. 5145 ("Defendant's Memo"), at 14.) On April 11, 1995, the GEB affirmed the decision of the General President, as modified on August 10, 1994. (Letter from Tom Sever, General Secretary–Treasurer of the International Brotherhood of Teamsters, to John Georgopoulos and Paul Auriemma (April 17, 1995) ("GEB Affirmation").) The GEB concurred with the General President's finding that plaintiffs' submission of forged signatures to the IBT in order to obtain out-of-work benefits for members who were not eligible to receive those benefits constituted embezzlement. *Id.* at 3–4. The GEB also rejected plaintiffs' claim that they were denied due process by not being shown questionnaire responses which alleged that plaintiffs were personally enriched by their actions because the GEB found that: (1) the General President's decision did not rely on evidence of plaintiffs' personal enrichment; and (2) the questionnaire responses "ha[d] no bearing" on the finding that plaintiffs permitted forgeries of out-of-work benefit forms in order to deceive the International

into issuing benefits to ineligible members. *Id.* at 4.

In addition, the GEB denied plaintiffs' contention that plaintiffs were not given adequate notice of the September EPC hearing. The GEB found that the April EPC hearing cured any alleged defects in the notice given to Georgopoulos and Auriemma regarding the September EPC hearing because the period of time that passed between the two hearings afforded plaintiffs adequate time to respond to the allegations set forth in the EPC's Specification of Charges. *Id.* Finally, the GEB repudiated plaintiffs' claim that the penalty imposed upon them by the General President was unduly harsh. The GEB observed that "there have been a number of General Executive Board decisions issued in which officers found guilty of embezzlement have been suspended from membership for longer periods of time than Georgopoulos and Auriemma." *Id.* Accordingly, the GEB affirmed the General President's August 10, 1994 decision in its entirety. *Id.*

Georgopoulos returned to his position as President of Local 138 in June 1995. (Defendant's Memo at 14.) Auriemma returned to his position as Secretary–Treasurer of Local 138 in September 1995. *Id.* Plaintiffs' filed the instant suit under the LMRDA in July 1995. They claim that defendant IBT denied them their right to due process, pursuant to LMRDA Section 101(a)(5), by relying on "evidence in the form of member responses to questionnaires, without affording plaintiffs an opportunity to examine, challenge or rebut said evidence," and by "fail[ing] to follow its own procedural rules in the conduct of hearings." (Amended Complaint at 9.) Plaintiffs further assert that the IBT's complained of conduct also violated Section 609 of the LMRDA. *Id.* Plaintiffs request that this Court: (1) void the disciplinary action taken against them by the IBT; (2) reinstate plaintiffs to office and membership in Local 138, retroactive to September 15, 1994; (3) award plaintiffs compensatory damages in the amount of $5,000 for emotional distress that defendants caused plaintiffs; and (4) award plaintiffs attorneys fees, litigation expenses, and costs. *Id.* at 10.

Along with their Complaint, plaintiffs filed a motion for a preliminary injunction seeking reinstatement of their memberships so that plaintiffs could participate in Local 138's December 1995, elections. (Letter from Daniel E. Clifton, Esq., to the Honorable David N. Edelstein, United States District Judge for the Southern District of New York, at 1 (July 31, 1995).) By letter dated July 31, 1995, however, plaintiffs informed this Court that "[t]he need for a preliminary injunction no longer exists, because a trusteeship was recently imposed on Local 138, and it is unlikely that elections will be held in December 1995." *Id.* at 1–2. Consequently, the parties submitted a Stipulation that plaintiff's motion for a preliminary injunction in this case be withdrawn. *Id.* On August 2, 1995, this Court "So Ordered" the parties' joint Stipulation. Stipulation and Order, *Georgopoulos v. International Bhd. of Teamsters,* 95 Civ. 5145 (Aug. 2, 1995) ("August 1995 Stipulation"). Because plaintiffs withdrew their motion for preliminary injunction, any arguments raised by plaintiffs in the papers they submitted in support of their motion for preliminary injunction are no longer before this Court.

Defendant IBT disputes the substantive legal claims contained in plaintiffs' Complaint. Defendant denies that plaintiffs were subject to discipline without the due process required under Section 101(a)(5) of the LMRDA. (Answer of International Brotherhood of Teamsters, AFL–CIO, to First Amended Complaint, *Georgopoulos v. International Bhd. of Teamsters,* 95 Civ. 5145 ("Answer"), at 1 (Aug. 31, 1995).) Defendant further claims: (1) that plaintiffs' complaint fails to state a claim upon which relief can be granted; (2) that plaintiffs have failed to exhaust all internal union and other remedies available to them prior to bringing the instant suit; (3) that plaintiffs are entitled to no relief from their claims against defendant; (4) that plaintiffs are not entitled to emotional distress damages for their claims against defendant; and (5) that the relief that plaintiffs seek is inconsistent with the Consent Decree. *Id.* at 8.

## DISCUSSION

Currently pending before this Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs "seek partial summary judgment voiding the improperly imposed discipline insofar as it affects their membership in Local 138." (Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment, *Georgopoulos v. International Bhd. of Teamsters,* 95 Civ. 5145 ("Plaintiffs' Memo"), at 2 (Mar. 4, 1996).) They assert that "[i]n the instant case, there are no genuine issues of material fact, and that plaintiffs are entitled to partial summary judgement" on their due process claim. *Id.* at 15; *see also* (Letter from Daniel E. Clifton, Esq., to the Honorable David N. Edelstein, United States District Judge for the Southern District of New York (Jan. 10, 1996).) Defendant opposes plaintiffs' summary judgement motion, denies that defendant violated any provision of the LMRDA, and cross-moves for summary judgment on all of plaintiffs' claims. (Defendant's Memo at 3.) Because both parties move this Court pursuant to Rule 56, this Court will review the legal principles governing Rule 56 motions before examining the parties' respective substantive claims.

### I. Rule 56

Pursuant to Rule 56, summary judgement is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC.,* 867 F.Supp. 262, 265 (S.D.N.Y.1994), and the party may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue which that party would have the burden of proof at trial. *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). As the Second Circuit has noted, "all ambiguities and inferences to be drawn from the underlying facts should be · resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988); *see also Celotex,* 477 U.S. at 330 n. 2, 106 S.Ct. at 2556 n. 2.

To defeat a motion for summary judgement, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Resolution Trust Corp. v. Hidden Ponds Phase IV Dev. Assocs.,* 873 F.Supp. 799, 804 (E.D.N.Y.1995). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Scottish Air,* 867 F.Supp. at 266. If the adverse party does not respond to the motion for summary judgement, "summary judgement, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e). Such an entry of summary judgment is inappropriate, however, "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, ... even if no opposing evidentiary matter is presented." Fed.R.Civ.P. 56(e) advisory committee's notes (1963 amendment).

The existence of a genuine issue of material fact depends on both the genuineness and the materiality of the issues raised by the motion. *See Scottish Air,* 867 F.Supp. at 266. To evaluate a fact's materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11–12 (2d Cir.1986), *cert.*

*denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). According to the Supreme Court, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a judge or jury to resolve the parties' differing versions of the truth at trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (quotation omitted).

In the Second Circuit, "summary judgment is not lightly granted, as it deprives the non-moving party of the opportunity for full factual development of the record through trial." *Perry v. International Longshoremen's Ass'n,* 638 F.Supp. 1441, 1445 (S.D.N.Y.1986) (citing *Jaroslawicz v. Seedman,* 528 F.2d 727, 731 (2d Cir.1975)). Only when "the entire record shows a right to judgment with such clarity as to leave no room for controversy, and establishes affirmatively that the adverse party cannot prevail under any circumstances" should a court grant a party's motion for summary judgment. *Id.; Heyman v. Commerce & Industry Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975).

### · II. LMRDA Section 101(a)(5)

■ In their Complaint, plaintiffs raise several claims, pursuant to LMRDA Section 101(a)(5). Plaintiffs move this Court for summary judgement on three of these claims. (Plaintiffs' Memo at 15–16.) Defendant denies these claims, asserts that it is entitled to summary judgement on them, and moves this Court for summary judgment on the remaining Section 101(a)(5) claims in plaintiffs' Complaint. (Defendant's Memo at 16–18.) A brief review of Section 101(a)(5) provides context for the parties' competing claims.

Section 101(a)(5) of the LMRDA states:

No member of any labor organization may be fined suspended, expelled, or otherwise disciplined except for nonpayment ·of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time period to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5).

As the Second Circuit has explained, LMRDA Section 101(a)(5) was "not intended

by Congress to constitute an invitation to the courts to intervene at will in the affairs of unions," *Gurton v. Arons,* 339 F.2d 371, 375 (2d Cir.1964), but rather to "guard[ ] against abusive and unjust exercises of union authority by prohibiting a union from disciplining a member without first affording him certain procedural safeguards against unwarranted or inaccurate adjudication." *Rosario v. Amalgamated Ladies' Garment Cutters Union,* 605 F.2d 1228, 1238 (2d Cir.1979), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980); *see Morrissey v. National Maritime Union,* 544 F.2d 19, 26 (2d Cir.1976). Congress "believed that only essential standards should be imposed by legislation, and that in establishing those standards, great care should be taken not to undermine union self-government." *United Steelworkers v. Sadlowski,* 457 U.S. 102, 117, 102 S.Ct. 2339, 2348, 72 L.Ed.2d 707, *reh'g denied,* 459 U.S. 899, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982); *Bernstein v. Nolan,* No. 90 Civ. 3213, 1990 WL 91728, at *6 (S.D.N.Y. June 28, 1990). Accordingly, courts are not to intrude upon internal union disciplinary actions except to uphold these minimum standards. *International Bhd. of Boilermakers v. Hardeman,* 401 U.S. 233, 242–44, 91 S.Ct. 609, 615–16, 28 L.Ed.2d 10 (1971); *Bernstein,* 1990 WL 91728, at *6.

It is unsurprising, then, that courts faced with challenges arising under Section 101(a)(5) recognize that union disciplinary proceedings are not judicial proceedings, and therefore, the full panoply of procedural safeguards found in such proceedings are not required. *See United States v. International Bhd. of Teamsters,* 964 F.2d 1308, 1312–13 (2d Cir.1992) (upholding admission of hearsay in union disciplinary hearing); *United States v. International Bhd. of Teamsters,* 870 F.Supp. 557, 560–61 (S.D.N.Y.1994) ("Constitutional due process does not require a that union member has the power to subpoena witnesses to appear at a union disciplinary hearing"); *Feltington v. Moving Pictures Mach. Operators' Union,* No. 77 Civ. 4417, 1977 WL 1807, at *5 (S.D.N.Y. Dec. 5, 1977) (" 'full and fair hearing' requirement for union disciplinary actions does not include the full panoply of safeguards guaranteed to criminal defendants"); *see also*

*Mayle v. Laborer's Intern.,* 866 F.2d 144, 146 (6th Cir.1988); *Frye v. United Steelworkers,* 767 F.2d 1216, 1223–24 (7th Cir.), *cert. denied,* 474 U.S. 1007, 106 S.Ct. 530, 88 L.Ed.2d 461 (1985); *Ritz v. O'Donnell,* 566 F.2d 731, 735 (D.C.Cir.1977). A handful of basic procedural components comprise the entirety of these safeguards.

 The most elemental procedural safeguard to which a union member subject to internal disciplinary proceedings is entitled "is an impartial trial body which arrives at its decision on the basis of evidence that the accused has an opportunity to rebut." *Berg v. Watson,* No. 75 Civ. 1644, 1977 WL 1728, at *3 (S.D.N.Y. Aug. 24, 1977). A union member must be given "adequate notice and a reasonable opportunity to defend, including the right to confront an accuser, to present evidence and to cross-examine witnesses." *Feltington,* 1977 WL 1807, at *3. The burden of proof regarding disciplinary charges against a union member is low—the charging party "must provide only "some evidence at the disciplinary hearing to support the charges made." *Hardeman,* 401 U.S. at 234, 91 S.Ct. at 611; *Bernstein,* 1990 WL 91728, at 12. Moreover, a union's reasonable interpretation of the scope of offenses for which it may discipline its members is entitled to deference. *Id.* 401 U.S. at 244–45, 91 S.Ct. at 616–17; *International Bhd. of Teamsters v. Local Union 810,* 19 F.3d 786, 788, 793 (2d Cir.1994); *Bernstein,* 1990 WL 91728, at *12.

Pursuant to Federal Rule of Civil Procedure 56, plaintiffs and defendant cross-move for summary judgment on plaintiffs' Section 101(a)(5) claims. Plaintiffs "seek partial summary judgment voiding the improperly imposed discipline insofar as it affects their membership in Local 138," (Plaintiffs' Memo at 2), on three grounds: (1) defendant denied plaintiffs their right to confront and cross-examine witnesses by refusing to provide plaintiffs access to information and witnesses regarding the EPC questionnaires that allegedly formed a basis of the disciplinary decision in this case, *id.* at 17; (2) defendant's contravened Section 101(a)(5)(C)'s requirement that a union "provided accused members with documents which are material to

the proof of the allegations against them," by refusing to provide plaintiffs access to information and witnesses regarding the EPC questionnaires, *id.* at 19–20; and (3) defendant's unreasonably interpreted the embezzlement charges levelled against plaintiffs. *Id.* at 20–22.

Defendant has cross-moved for summary judgment on these three claims. Defendant also moves for summary judgment on the remaining Section 101(a)(5) claims contained in plaintiff's Complaint: (1) that defendant failed to follow its own procedural rules in conducting plaintiffs' disciplinary hearing; and (2) that defendant's findings regarding plaintiffs' disciplinary charges were based on insufficient evidence.

For the foregoing reasons, this Court finds that "the entire record shows a right to judgment [for defendant] with such clarity as to leave no room for controversy, and establishes affirmatively that [plaintiffs] cannot prevail under any circumstances." *Perry,* 638 F.Supp. at 1445. This Court accordingly finds that defendant is entitled to summary judgment on all of the aforementioned claims, pursuant to Rule 56 and the substantive law governing Section 101(a)(5). This Court will discuss each of these claims in turn.

## A. *Plaintiffs' Claim that Defendant Denied Plaintiffs' Right to Confront and Cross–Examine Witnesses*

Plaintiffs assert that "[i]n deciding this case, the IBT relied upon evidence against Georgopoulos and Auriemma—the questionnaire responses—without permitting them to even see the evidence, much less respond to it." (Plaintiffs' Memo at 15–16.) Plaintiffs maintain that the IBT's refusal to allow plaintiffs to "confront the individuals who responded to the EPC questionnaires," constituted a denial of plaintiffs' statutorily protected right to cross-examine witnesses against them, and thus violated their due process rights under LMRDA Section 101(a)(5). *Id.* at 17.

Defendant disputes this claim, and characterizes plaintiffs' assertion that they were denied access to information and witnesses concerning the EPC questionnaires as "spe-cious." *Id.* at 19. Defendant maintains that plaintiffs cannot prove that the questionnaires were either relevant to the disciplinary findings against plaintiffs, or even considered as evidence by the General President and the EPC. *Id.* In fact, defendant claims that both the GEB's final decision regarding plaintiffs and "all of the evidence of record, including plaintiff Georgopoulos' Affidavit, evidences that the [EPC] questionnaires and their responses were not considered in the cases against the plaintiffs." *Id.*

Having reviewed the parties' competing claims and submissions, this Court finds that defendant has accurately described plaintiffs' first claim as "specious." Although plaintiffs are correct that LMRDA Section 101(a)(5)(C) protects a union member's right to "confront an accuser, ... and to cross-examine witnesses," *Feltington,* 1977 WL 1807, at *3, plaintiffs fail to provide any evidence that defendant denied plaintiffs this right in the instant case. Plaintiffs' submissions contain no factual evidence that the questionnaires at issue were relevant to either the General President's or the GEB's decisions. The record of plaintiffs' underlying disciplinary proceedings is similarly devoid of any reference or citation to these questionnaires.

Defendant, on the other hand, has demonstrated to this Court that "the questionnaires and their responses were not considered in the cases against plaintiffs." (Defendant's Memo at 19.) Defendant highlights a section of the GEB's affirmance of the General President's decision stating that the evidence contained in the questionnaires "was not relied upon by the General Secretary to render his decision...." (GEB Affirmation at 4.) Moreover, defendant directs this Court's attention to Georgopoulos' own affidavit in which he concedes that during the EPC "hearing, the EPC Panel made no mention of the questionnaire that had been sent out or of any responses to the questionnaire and, obviously, no such responses were entered into evidence." (Affidavit of John Georgopoulos, *Georgopoulos v. International Bhd. of Teamsters,* 96 Civ. 5145 ("Georgopoulos Aff."), ¶ 43 (March 3, 1996).)

As previously stated, summary judgement is appropriate only where "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In light of the overwhelming absence of evidence that the EPC questionnaires were used as evidence against plaintiffs, this Court finds that the questionnaires and their responses were not used as evidence against plaintiffs. Moreover, because the EPC questionnaires and responses were not used against plaintiffs, this Court finds that defendant's alleged refusal to provide plaintiffs access to information and witnesses regarding the questionnaires did not deprive plaintiffs' of their right to confront and cross-examine witnesses against them. Accordingly, this Court finds that plaintiffs have failed to satisfy their burden of demonstrating to this Court that there is an absence of evidence to support defendant's case, *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552, while defendant has come forward with sufficient evidence to demonstrate both the absence of a genuine issue of material fact and defendant's right to a judgment as a matter of law on this issue. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608. This Court thus finds that plaintiffs' motion for summary judgment on this claim should be denied, and that defendant's motion for summary judgment on this claim should be granted.

*B. Plaintiffs' Claim that Defendant Failed to Provide Plaintiffs with Documents Material to the Allegations Against Them*

██ Plaintiffs second Section 101(a)(5) claim also concerns the EPC questionnaires. Plaintiffs assert that "[a] union must provide accused members with documents which are material to the proof of the allegations against them," and that "[f]ailure to do so constitutes a failure to provide a charged member with the due process required under Section 101(a)(5)." *Id.* at 19–20. Plaintiffs claim that the IBT's failure to provide plaintiffs with copies of the EPC questionnaires and the responses to them violated their due process rights under Section 101(a)(5)(C). *Id.* at 20. Defendant denies that the EPC questionnaires were material to either the

General President's or the GEB's decision regarding plaintiffs. (Defendant's Memo at 20.)

This Court finds that plaintiffs' second claim is fallacious. As an initial matter, this Court notes that plaintiffs' have cited no relevant case law in support of this claim. Instead, plaintiffs rely entirely on two cases from jurisdictions other than the Second Circuit, which obviously, are not controlling in the Second Circuit. *See id.* at 19–20 (citing cases from the Sixth and Seventh Circuits). Moreover, this Court's own research reveals no Second Circuit case law that supports plaintiffs' claim that "[a] union must provide accused members with documents which are material to the proof of the allegations against them."

This Court reminds plaintiffs that Rule 11 of the Federal Rules of Civil Procedure provides for the imposition of sanctions upon an attorney who submits signed papers containing "claims, defenses, and other legal contentions" that are not "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed.R.Civ.P. 11(b)(2). Plaintiffs papers fail to inform this Court that plaintiffs' claim that "[a] union must provide accused members with documents which are material to the proof of the allegations against them," is unsupported by existing Second Circuit case law. They further fail to suggest any argument—frivolous or not—for the "extension, modification, or reversal of existing law or the establishment of new law," regarding this issue. This Court notes that plaintiffs' failure to inform this Court that their argument is not "warranted by existing law," and to proffer a "nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law" contravenes the express terms of Rule 11. This Court suggests to plaintiffs that future submissions to this Court comply with both the letter and spirit of Rule 11.

Even if the instant Section 101(a)(5) claim were based on relevant Second Circuit case law, this Court finds that plaintiffs would not be entitled to relief in the instant case be-

cause plaintiffs have utterly failed to allege any facts in support of this claim. As discussed immediately above, the EPC questionnaires played no part in defendant's decisions regarding the disciplinary charges against plaintiffs. As a result, this Court finds that these documents were not "material to the proof of the allegations against [plaintiffs]," and thus, defendant's alleged failure to provide plaintiffs these documents does not contravene the principles embodied in LMRDA Section 101(a)(5)(C). This Court therefore finds that "the entire record shows a right to judgment [for defendant] with such clarity as to leave no room for controversy, and establishes affirmatively that [plaintiffs] cannot prevail under any circumstances." *Perry*, 638 F.Supp. at 1445. Accordingly, this Court finds that plaintiffs' motion for summary judgment on this claim is meritless, and that defendant is entitled to summary judgment on this claim.

### C. Plaintiffs' Claim that the IBT Unreasonably Interpreted the IBT Constitution

The final Section 101(a)(5) claim for which plaintiffs seek summary judgment challenges defendant's interpretation of the term "embezzlement" as used in defendant's findings regarding plaintiffs' disciplinary charges. Plaintiffs claim that "[i]t is so axiomatic as to seem ontological that embezzlement in any sense of the word requires the personal use or appropriation of the property entrusted to defendant." (Plaintiffs' Memo at 21.) They explain that the EPC found an absence of credible evidence showing that Local 138 members did not actually receive their out-of-work benefit money, and assert if all the benefit money were distributed to the intended recipients, then plaintiffs could neither have personally used nor appropriated the money. *Id.* at 20–22. Plaintiffs continue that "[i]f Georgopoulos and Auriemma did not personally appropriate the out-of-work benefits, a finding of embezzlement was impossible, because the most essential elements of the 'crime' simply had not occurred and could not be proven." *Id.* at 21–22.

Defendant counters that well settled legal principles undermine this claim. The IBT

asserts that "[i]n internal union governance cases, reviewing courts are to give deference to the union's interpretation of its constitution and governing documents so long as the interpretations are not patently unreasonable." *Id.* at 20. It explains that "[u]nder settled law governing enforcement of the Consent Decree and interpreting the IBT Constitution, evidence of 'personal gain'—the only possible evidentiary purpose of the questionnaire—is not required for a finding, as made here, of embezzlement." *Id.* at 21. Because the GEB's finding regarding embezzlement in the instant case is consistent with Consent Decree law regarding embezzlement, defendant contends that "it was not only reasonable, but perfectly appropriate, for the IBT to find that direct evidence of 'personal gain' was not required to sustain a charge of embezzlement and, therefore, to sustain the charges brought against plaintiffs without referring to or even considering the questionnaire evidence." *Id.*

As previously stated, Congress intended that courts faced with challenges pursuant to LMRDA Section 101(a)(5) should take "great care ... not to undermine union self-government." *Sadlowski*, 457 U.S. at 117, 102 S.Ct. at 2348; *Bernstein*, 1990 WL 91728, at *6. In light of this aim, the Supreme Court has held that Section 101(a)(5) "was not intended to authorize courts to determine the scope of offenses for which a union may discipline its members." *Hardeman*, 401 U.S. at 244, 91 S.Ct. at 616; *see Pearl v. Tarantola*, 361 F.Supp. 288, 292 (S.D.N.Y.1973). Accordingly, section 101(a)(5) "gives courts no warrant to scrutinize the union regulations in order to determine whether particular conduct may be punished at all." *Hardeman*, 401 U.S. at 245, 91 S.Ct. at 616.

Article XIX, Section 7 of the IBT Constitution sets forth the "Grounds for Charges Against Members, Officers and Subordinate Bodies." Among the conduct which constitutes a "basis for charges against members, officers, elected Business Agents, Local Unions, Joint Councils or other subordinate bodies for which he or it shall stand trial" is "[b]reaching a fiduciary obligation owed to any labor organization by any act of embezzlement or conversion of union's funds or

property." IBT Const., Art. XIX, § 7(b)(3). It is well settled that to sustain a charge of embezzlement, the IBT "must establish that the charged IBT member acted with fraudulent intent to deprive the Union of its funds." *United States v. International Bhd. of Teamsters [Wilson, Weber, & Dickens]*, 787 F.Supp. 345, 352 (S.D.N.Y.1992) (internal quotations omitted); *see United States v. International Bhd. of Teamsters [Salvatore]*, 754 F.Supp. 333, 338 (S.D.N.Y.1990). Circumstantial evidence can be used to prove fraudulent intent. *Wilson, Weber & Dickens*, 787 F.Supp. at 352.

This Court has affirmed internal IBT disciplinary actions against members charged with embezzlement under this standard. *See id.; Salvatore*, 754 F.Supp. at 338–39. In *Wilson, Weber, & Dickens*, for example, the former President and Secretary–Treasurer of IBT Local 100 were disciplined for embezzlement because they failed to obtain the necessary executive board approval for charitable contributions made with local funds. 787 F.Supp. at 352. This Court affirmed the discipline imposed by the IBT on Dickens and Weber because

> [t]he evidence clearly demonstrated that the expenditures were made without Executive Board approval, in violation of Section 16(A) of the Local's by-laws. Dickens and Weber had an affirmative duty to obey their oath of office and to obey Section 16(A) of the by-laws. Dickens' and Weber's failure to comply with Section 16(A) gives rise to an inference of fraudulent intent.

*Id.* This Court further found that Dickens and Weber were "well aware of the by-law's requirement that they obtain Executive Board approval for the contributions in question," and that their failure to comply with Rule 16(A) supported a finding of fraudulent intent sufficient to sustain their charges of embezzlement. *Id.*

On appeal, the Second Circuit affirmed these findings. The court explained that "[b]ecause embezzlement is a specific intent offense, a defendant may not be said to have a fraudulent intent when there is a finding that he has a 'good-faith belief both that the funds were expended for the union's benefit

and that the expenditures were authorized (or would be ratified) by the union.'" *United States v. International Bhd. of Teamsters [Wilson, Weber, & Dickens]*, 978 F.2d 68, 72 (2d Cir.1992). The Court continued that "[i]t was not arbitrary and capricious for the [union] here to discredit the good-faith assertions of Weber and Dickens" because numerous factors undermined Weber's and Dickens' credibility. *Id.* at 73. These factors included: (1) the "detailed union bylaws and accounting rules that explicitly require executive board approval for charitable expenditures"; (2) Weber's and Dickens' "aware[ness] of past abuses within the IBT"; (3) minutes of the local's executive board meeting that conflicted with Weber's and Dickens' explanation of the expenditures in question; and (4) the union's belief that some of these expenditures "were really personal entertainment." *Id.*

Both the opinion of this Court and that of the Second Circuit in *Wilson, Weber & Dickens* support defendant IBT's interpretation of the embezzlement charge underlying the case at bar. Moreover, this Court notes that the facts in *Wilson, Weber & Dickens* and those in the instant case are virtually identical. In both cases, the President and Secretary–Treasurer of an IBT local authorized the expenditure of union funds in a manner that contravened union rules and procedures of which they admittedly were aware. Moreover, both the union and the courts in *Wilson, Weber & Dickens*, and the union in the present case found that only "fraudulent intent"—not "personal gain"—was necessary to support a charge of embezzlement. *See e.g., Wilson, Weber & Dickens*, 787 F.Supp. at 352; 978 F.2d at 72–73 (IRB Letter at 1); (GEB Affirmation at 3–4.) Given the striking similarities between the offending IBT members, the factual circumstances, and the charges in *Wilson, Weber & Dickens* and those in the instant case, this Court finds that *Wilson, Weber & Dickens* totally undermines plaintiffs' claims regarding their embezzlement charge.

In light of this authority, this Court finds that plaintiffs claim that "embezzlement in any sense of the word requires the personal use or appropriation of the property entrust-

ed to defendant," (Plaintiffs' Memo at 21), is neither "axiomatic" nor "ontological." In fact, the above discussion proves that only plaintiffs' misunderstanding of relevant legal principles is "axiomatic" or "ontological" in the instant case. Accordingly, this Court finds that plaintiffs are not entitled to summary judgment on this claim. Conversely, this Court finds that the undisputed facts of this case and the clear holding of *Wilson, Weber & Dickens* "establish affirmatively that the [plaintiff] cannot prevail under any circumstances," *Perry*, 638 F.Supp. at 1445, and that defendant is entitled to summary judgement on this issue as well.

### D. Plaintiffs' Claim that Defendant failed to Follow its own Procedural Rules

■ In their complaint, plaintiffs allege that defendant "failed to follow its own procedural rules in the conduct of the hearings" on plaintiffs' disciplinary charges. (Amended Complaint, ¶ 37(a).) According to the papers defendant submitted in support of it motion for summary judgment, plaintiffs raised several specific procedural challenges in the motion for a preliminary injunction that originally accompanied plaintiffs' motion for summary judgment. (Defendant's Memo at 25–26.) As previously discussed, plaintiffs withdrew this claim pursuant to a joint Stipulation "So Ordered" by this Court on August 2, 1995. (August 1995 Stipulation.) Accordingly, any arguments raised by plaintiffs in the papers they submitted in support of their motion for a preliminary injunction are no longer before this Court.

In response to the procedural claim raised in plaintiffs' Complaint, defendant moves for summary judgment on this issue. (Defendant's Memo at 16–17, 24.) Defendant contends that the record demonstrates that plaintiffs had both notice and an opportunity to prepare their defense to the disciplinary charges against them, as required by LMRDA Section 101(a)(5)(B). It recounts the events leading up to plaintiffs' September EPC hearing to demonstrate that plaintiffs had almost three weeks notice prior to this hearing, and that plaintiffs attended this hearing "well prepared to present their defense, which they did." *Id.* at 24. Defen-

dant similarly reports that the April EPC hearing "was closed only after each plaintiff stated that he had no additional facts or arguments to make." *Id.* at 25. Moreover, defendant points to the hearing transcript to demonstrate that plaintiffs were afforded every opportunity to present their case at both EPC hearings, and specifically notes that plaintiffs called witnesses to testify on plaintiffs' behalf, submitted documentary evidence in support of their case, and offered extensive argument in their defense. *Id.* In addition, defendant maintains that it adhered to all applicable procedural rules in the conduct of plaintiffs' disciplinary actions. *Id.* at 24, 26.

Although plaintiffs filed a memorandum of law in opposition to defendant's motion for summary judgment, plaintiffs memo is devoid of reference to any of the aforementioned procedural issues. Plaintiffs' memo rehashes plaintiffs' claims regarding the EPC questionnaires, but utterly fails to respond to defendant's claims that: (1) plaintiffs had adequate notice and opportunity to prepare their defense; and (2) defendants adhered to all applicable procedural rules in the conduct of plaintiffs' disciplinary hearings. This Court notes that plaintiffs filed this memo on April 1, 1996, well after plaintiffs' preliminary injunction papers and their accompanying claims were withdrawn.

It is clear that to defeat a motion for summary judgement, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," Fed. R.Civ.P. 56(e); *Scottish Air*, 867 F.Supp. at 266, and that if the adverse party does not respond to the motion for summary judgement, "summary judgement, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e). Despite plaintiffs' failure to respond to defendant's motion for summary judgement on the aforementioned procedural issues, this Court painstakingly examined the record underlying the instant case for evidence that defendant violated plaintiffs' due process rights under LMRDA Section 101(a)(5)(A)–(B) during the course of plaintiffs' disciplinary actions. This examination reveals none.

It is clear that defendant provided plaintiffs "written specific charges" as required by LMRDA Section 101(a)(5)(A). *See* (Letter from Aaron Belk, International Vice President and EPC Administrator, to Tom Gilmartin, Jr., Eastern Conference of Teamsters, Ethical Practices Committee Panel, at 1 (Aug. 20, 1993).) As quoted earlier, the Specification of Charges provided to plaintiffs by the EPC described the events and actions underlying defendant's accusations against plaintiffs in a clear and detailed fashion. *See id.* Based on the detail spelled out *in extenso* in this document, this Court finds the Specification of Charges "specific enough to inform [plaintiffs] of the offenses that [they] allegedly committed." *Hardeman,* 401 U.S. at 245, 91 S.Ct. at 617 (internal citation omitted). Accordingly, this Court finds that defendants did not violate plaintiffs' right to be "served with written specific charges" pursuant to Section 101(a)(5)(A) of the LMRDA.

It is similarly evident that defendant complied with the notice requirement of LMRDA Section 101(a)(5)(B). Both the record of plaintiffs' disciplinary proceedings and plaintiffs' own submissions to this Court demonstrate that plaintiffs received sufficient notice of the charges against them to comport with the notions of due process contained in Section 101(a)(5)(B) of the LMRDA. For example, plaintiffs' received a written copy of the Specification of Charges from the EPC almost three weeks before the September EPC hearing, (Georgopoulos Aff., ¶ 32); *see also* (August 20, 1993 Gilmartin Letter), written notice of the September EPC hearing almost two weeks before the scheduled hearing date, (Georgopoulos Aff., ¶ 32); *see also* (August 30, 1993 Gilmartin Letter), and copies of the IRB Report and exhibits regarding the disciplinary charges against them approximately two weeks before the September EPC hearing. (Georgopoulos Aff., ¶ 33); (Plaintiffs' Memo at 6.) Moreover, at the conclusion of the September EPC hearing, plaintiffs were informed that the EPC intended to continue its investigation of plaintiffs, and were advised of the subjects that the EPC intended to pursue during this investigation. (Georgopoulos Aff., ¶ 35.) During the almost seven months between the September and April

EPC hearings, plaintiffs received documentation from defendant regarding this ongoing investigation. *Id.,* ¶¶ 36–38. Prior to the April EPC hearing, plaintiffs received almost three weeks notice of this event. *Id.,* ¶ 41. In light of both the timing and quality of the information defendant provided plaintiffs regarding the disciplinary proceedings against plaintiffs, this Court finds that plaintiffs had more than adequate notice of all proceedings against them, as required by section 101(a)(5)(B) of the LMRDA.

To reiterate, despite plaintiffs failure to address any of the bases for defendant's motion for summary judgment on plaintiffs' claim that defendant "failed to follow its own procedural rules," this Court carefully examined the entire record of the underlying disciplinary proceedings in order to vindicate plaintiffs' statutorily protected due process rights. This examination unequivocally establishes that defendant adhered to the relevant procedural rules in the conduct of plaintiffs' disciplinary hearing, and that plaintiffs' allegations to the contrary are devoid of substance. Rule 56 authorizes a court to grant a party's unopposed motion for summary judgment "if appropriate." Fed.R.Civ.P. 56(e). Because plaintiffs' failed to respond to defendant's motion for summary judgment on this issue, and because the allegations contained in Plaintiffs' Complaint are devoid of substance, this Court finds granting defendant's unopposed motion for summary judgment on this issue is appropriate.

*E. Plaintiffs' Claim that Defendant's Decision is Unsupported by the Record*

Throughout the papers plaintiffs submitted to this Court, plaintiffs maintain that the evidence on record in this case does not support defendant's conclusion that the disciplinary charges against plaintiffs had been proven. (Plaintiffs' Memo at 20–24); (Plaintiffs' Opposition Memo at 6–10.) Defendant moves for summary judgment on this claim. It asserts that defendant's decision regarding plaintiffs' disciplinary charges and the penalty imposed upon plaintiffs are both adequately supported by the record in the instant case. Defendant claims that the LMRDA requires only that the charging party "pro-

vide some evidence at the disciplinary hearing to support the charges made." *Id.* at 23. It further maintains that there are no factual disputes regarding plaintiffs' underlying conduct in this case because plaintiffs both admitted to facts demonstrating "at a minimum, some evidence of a fraudulent intent to deprive the Union of its funds," and conceded that such facts violate the IBT Constitution. *Id.* Because there is more than "some evidence" to support the charges against plaintiffs, defendant concludes that the decisions of the IBT should not be disturbed by this Court. *Id.* at 24.

▮▮▮▮▮ Once again, this Court observes that the memorandum of law that plaintiffs filed in opposition to defendant's motion for summary judgment is devoid of reference to defendant's aforementioned claims, and that if an adverse party does not respond to the motion for summary judgement, "summary judgement, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e).

Regardless of plaintiffs' failure to respond to the instant motion for summary judgement, this Court finds that it is appropriate to enter summary judgment for defendant on this issue. As the Supreme Court has made clear, a full and fair disciplinary hearing under the LMRDA requires "the charging party to provide [only] some evidence at the disciplinary hearing to support the charges made." *Hardeman,* 401 U.S. at 245, 91 S.Ct. at 616. The record in this case reveals that defendant produced both witnesses and documentary evidence at the September and April EPC hearings that substantiate the charges against plaintiffs. *See generally* (Tr.) More importantly, plaintiffs themselves admitted to engaging in the conduct that forms the basis of the disciplinary charges against them. *Id.* at 22–23; 90–98; 123–27; 135–37; 145–54. This Court finds that this evidence, coupled with plaintiffs' own admissions, constitutes more than "some evidence" to support the charges against plaintiffs. Accordingly, this Court finds that defendants have demonstrated an absence of a genuine issue of material fact on the issue whether defendant satisfied its evidentiary burden under LMRDA Section 101(a)(5), and

that defendant is thus entitled to summary judgment on this issue.

### III. LMRDA Section 609

▮▮▮▮ In their complaint, plaintiffs assert that the actions taken by the IBT throughout plaintiffs' union disciplinary proceedings violate LMRDA Section 609. (Amended Complaint, ¶¶ 40–41.) Although plaintiffs do not seek summary judgment on this claim, defendant moves this Court for summary judgment on this issue.

Section 609 of the LMRDA provides:

It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this Act. The Provisions of [29 U.S.C. § 412] shall be applicable in the enforcement of this section.

29 U.S.C. § 529.

Section 609 of the LMRDA provides a cause of action for a the wrongful removal of a union member from union membership because of the member's exercise of rights granted him under the LMRDA. *See Finnegan v. Leu,* 456 U.S. 431, 437, 102 S.Ct. 1867, 1871, 72 L.Ed.2d 239 (1982); *Petramale v. Local 17, Laborers Int'l Union,* 736 F.2d 13, 17 (2d Cir.), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 593, 83 L.Ed.2d 702 (1984). Among the rights that give rise to a claim of wrongful removal are the right of expression, *Petramale,* 736 F.2d at 17–18, and the right to due process. *Murphy v. International Union of Operating Engineers,* 774 F.2d 114 (6th Cir. 1985), *cert. denied* 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986). Violation by a union of a member's statutorily protected rights is thus a necessary prerequisite to any claim arising under Section 609.

Defendant claims that "plaintiffs cannot show that the disciplinary proceedings brought against them were brought in retaliation for any protected conduct." (Defendant's Memo at 28.) On the contrary, defendant explains that the disciplinary charges against plaintiffs "began as charges proposed

by the IRB, charges which contained serious allegations of financial malfeasance." *Id.* Moreover, defendant contends that "there is ample uncontroverted factual evidence to support the charges and penalty affirmed by the GEB against plaintiffs," that defendant followed all applicable procedural rules in conducting plaintiffs' disciplinary hearings, and that defendant adhered to the due process requirements of the LMRDA Section 101(a)(5). *Id.*

Although plaintiffs responded to defendant's motion for summary judgement, plaintiffs' response virtually ignores defendant's Section 609 arguments. In the eleven-page memorandum plaintiffs submitted to this Court in opposition to defendant's motion for summary judgment, plaintiffs mention Section 609 only twice, and only in footnotes. (Plaintiffs' Memo in Opposition at 7 n. 1 & 8 n. 2.) The entirety of these footnotes is as follows:

> Disciplining a member on several charges, one or more of which is based on activity protected under Section 101(a)(2), violates Section 609 of the LMRDA.

*Id.* at 7 n. 1 (citations omitted).

> Courts have also held that it is a violation of Section 609 of the LMRDA to discipline a member on one or more charges where the procedural safeguards contained in Section 101(a)(5) are not provided with respect to one of the charges.

*Id.* at 8 n. 2 (citations omitted).

While these footnotes express plaintiffs' opinion regarding the legal principles governing a Section 609 claim, they are devoid of the factual argument necessary to oppose a motion for summary judgement. As previously stated, to defeat a motion for summary judgement, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Scottish Air,* 867 F.Supp. at 266. If the adverse party does not properly respond to the motion for summary judgement, "summary judgement, if appropriate, shall be entered against the adverse party." Fed. R.Civ.P. 56(e). Once again, these principles support this Court's finding that defendant is entitled to summary judgement.

■ This Court find that plaintiffs' have failed to prove—or even to allege—that defendant disciplined plaintiffs for exercising any right to which the LMRDA entitled them. As this Court's previous discussion of plaintiffs' Section 101(a)(5) claims makes clear, defendant adhered to all applicable procedural rules in the conduct of plaintiffs' disciplinary proceedings. Because plaintiffs received all the process due them under Section 101(a)(5) of the LMRDA, this Court finds that plaintiffs' claim that defendant violated Section 609 by disciplining plaintiffs without due process is meritless.

■ Moreover, plaintiffs' fail to demonstrate that defendant violated Section 609 by violating plaintiffs' right of expression. In the text of their Memorandum in Opposition, plaintiffs discuss at length a Second Circuit case concerning a union's violation of its member's right of expression, *Petramale v. Local No. 17 Laborers Int'l Union,* 736 F.2d 13 (2d Cir.), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 593, 83 L.Ed.2d 702 (1984). In *Petramale,* a union member was disciplined by his union for disrupting a union meeting and for making slanderous statements critical of union officials. *Id.* at 15–16. Under LMRDA Section 101(a)(2), however, imposing discipline on a union member for criticizing union officials, even when the criticism amounts to slander, violates the LMRDA. *Id.* at 16–17. Although the union in *Petramale* attempted to distinguish the "legitimate" charge of disrupting the union meeting from the offending slander charge, the Second Circuit rejected this effort because the union made no attempt "to differentiate between conduct which was disruptive in the usual sense and conduct which was disruptive because it criticized union officers." *Id.* at 18.

Plaintiffs appear to argue that *Petramale* governs this Court's inquiry in the instant case. (Plaintiffs' Memo in Opposition at 6–8.) This Court finds this argument frivolous for two reasons. First, the Second Circuit's holding in *Petramale* is based exclusively on a violation of Section 101(a)(2) of the LMRDA, not Section 101(a)(5). Section 101(a)(2) guarantees that "[e]very member of any labor organization shall have the right . . . to express any views, arguments, or

opinions," subject to certain "limited exception." 29 U.S.C. § 411(a)(2). The Second Circuit reversed the union's imposition of discipline in *Petramale* because "when union discipline is imposed on the basis of a combination of factual allegations an essential element of which is protected speech, the discipline as a whole is invalid under the LMRDA." *Petramale,* 736 F.2d at 16. As plaintiffs themselves concede, "the statutory context is different" in *Petramale* than in the instant case. (Plaintiffs' Memo in Opposition at 8.) The Second Circuit's holding in *Petramale* is thus inapplicable to this Court's resolution of the instant case.

Second, even if the statutory basis for plaintiffs' claim were the same as that in *Petramale,* plaintiffs' papers are devoid of factual allegations that would support such a claim. This Court's review of plaintiffs' Complaint and memoranda of law reveals not a single fact that would support this Court finding defendant culpable of violating plaintiffs' right of expression. Consequently, this Court finds that plaintiffs cannot support their Section 609 claim on freedom of expression grounds. Accordingly, defendant is entitled to summary judgment on plaintiffs' Second Cause of Action regarding Section 609 of the LMRDA.

■ The legal arguments tucked away in the footnotes of Plaintiffs' Reply Brief do not require a different result. As is the practice in this Court, this Court studied the cases cited in plaintiffs' footnotes in order to verify that they support the propositions for which plaintiff cited them. As a result of this study, this Court made two discoveries.

First, plaintiffs attorneys failed to provide this Court accurate citations to the cases upon which they base their Section 609 Arguments. For example, in their first footnote, plaintiffs cite "*Pearl v. Tarantola,* 361 F.Supp. 288, 294 (S.D.N.Y.1973)." (Plaintiffs' Memo in Opposition at 7 n. 1.) As cited earlier in this opinion, this case is actually reported at 361 F.Supp. 288. In their second footnote, plaintiffs cite "*Eisman v. Baltimore Reg. Joint Board,* 352 F.Supp. 429, 436, *aff'd* 496 F.2d 1313 (4th Cir.1974)." *Id.* at 8 n. 2. Although plaintiffs' Fourth Circuit cite is correct, plaintiffs miscited the district court's

decision in this case—the correct citation is 352 F.Supp. 429.

Second, and more importantly, the majority of the cases plaintiffs cite in support of their Section 609 claims do not support propositions for which plaintiffs cited them. For instance, plaintiffs cite *Pearl v. Tarantola* in support of their claim that "[d]isciplining a member on several charges, one or more of which is based on activity protected under Section 101(a)(2), violates Section 609 of the LMRDA." (Plaintiffs' Memo in Opposition at 7 n. 1.) Although *Pearl* clearly holds that expelling a union member for exercising his right of expression violates Section 101(a)(2) of the LMRDA, 361 F.Supp. at 293, it contains no mention of, or holding regarding, Section 609.

The two cases plaintiffs cite in their second footnote similarly fail to support the proposition for which they were cited. To reiterate, plaintiffs' second footnote states: "[c]ourts have also held that it is a violation of Section 609 of the LMRDA to discipline a member on one or more charges where the procedural safeguards contained in Section 101(a)(5) are not provided with respect to one of the charges." (Plaintiffs' Memo in Opposition at 8 n. 2.) In support of this statement, plaintiffs cite two cases—"*Gleason v. Chain Service Restaurant Employees,* 422 F.2d 342 (2d Cir.1970); *Eisman v. Baltimore Reg. Joint Board,* 353 [sic] F.Supp. 429, 436, *aff'd* 496 F.2d 1313 (4th Cir.1974)." *Id.* Both cases are wholly unrelated to, and in fact, do not even mention, LMRDA Section 609. The text of the *Gleason* case contains not a single citation to LMRDA Section 609, let alone an interpretation of the statute's meaning. Both the district court and appellate court decisions in *Eisman* suffer the same defect.

Once again, this Court reminds plaintiffs that Rule 11 of the Federal Rules of Civil Procedure provides for the imposition of sanctions upon an attorney who submits signed papers containing "claims, defenses, and other legal contentions" that are not "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed.R.Civ.P. 11(b)(2). As previously stated, plaintiffs' Section 609

claims are neither warranted by existing Second Circuit law, nor accompanied by any argument for the extension, modification or reversal of existing law. In addition, most of the cases that plaintiffs cite in support of their various claims do not even support the propositions for which they were cited. Moreover, plaintiff reliance on *Petramale* and other case law pertaining to LMRDA Section 101(a)(2) injects both law and argument into this case that are wholly unrelated to the causes of action contained in plaintiffs' complaint, the disciplinary action underlying the instant litigation, and this Court's resolution of the instant litigation.

▬ A court must apply a "test of objective reasonableness," to determine whether a groundless claim warrants the imposition of sanctions under Rule 11. *Cross & Cross Properties, Ltd. v. Everett Allied Co.,* 886 F.2d 497, 504 (2d Cir.1989). In this circuit, a court may impose sanctions only "where it is clear that: (1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; and (3) no reasonable argument has been advanced to extend, modify or reverse the law as it stands." *Id.*

▬ This Court finds that plaintiffs' repeated misstatements, miscitations, and mistakes of law militate against a finding that plaintiffs' counsel made "an inquiry reasonable under the circumstances," Fed. R.Civ.P. 11(b), into the law governing claims arising under LMRDA Section 609. Nevertheless, this Court is reluctant to impose sanctions in the instant case because the law is unsettled regarding the question whether Rule 11 is violated when an attorney presents an argument for the extension of existing law in a manner that created the impression that it is based on existing law. 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1335 (1990). This Court does find, however, that plaintiffs' papers are inaccurate, poorly drafted, and an embarrassing example of shoddy lawyering. This Court reminds plaintiffs' counsel that an attorney is an officer of the court, and that he

plays his role badly, and trespasses against the obligations of professional responsibilities, when his desire to win leads him to muddy the headwaters of decision, when, instead of lending a needed perspective to the controversy, he distorts and obscures its true nature.

*Id.,* § 1334, at p. 56 n. 14. Counsel is admonished to heed these words in future dealings with this or any other court.

### CONCLUSION

IT IS HEREBY ORDERED THAT plaintiffs' motion for summary judgment is DENIED.

IT IS FURTHER ORDERED THAT defendant's motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED THAT plaintiffs' First Amended Complaint is DISMISSED.

SO ORDERED.