Frank DeCARLO, Plaintiff,

v.

Frank SALAMONE, et al., Defendants.

No. 96–CV–6199L.

United States District Court,
W.D. New York.

Sept. 24, 1997.

Ronald J. Passero, Passero & Meserve, Rochester, NY, for Frank DeCarlo.

William P. Smith, Jr., Woods, Oviatt, Gilman, Sturman & Clarke, Rochester, NY, Lucinda Odell Lapoff, Chamberlain & Greenfield, Rochester, NY, for Frank Salamone, John Kuitems.

William P. Smith, Jr., Woods, Oviatt, Gilman, Sturman & Clarke, Rochester, NY, Lucinda Odell Lapoff, Chamberlain & Greenfield, Rochester, NY, Mark G. Pearce, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, L.L.P., Buffalo, NY, for United Brotherhood of Carpenters and Joiners of America, Rochester Local Carpenters Local 85.

William P. Smith, Jr., Woods, Oviatt, Gilman, Sturman & Clarke, Rochester, NY, for the United Brotherhood of Carpenters and Joiners of America, AFL–CIO.

## DECISION AND ORDER

LARIMER, Chief Judge.

This dispute arises out of plaintiff Frank DeCarlo's suspension from the United Brotherhood of Carpenters and Joiners of America, Rochester Local 85 ("Local 85"). DeCarlo asserts that Local 85 and two of its officers violated his "free speech" rights guaranteed by Section 101(a)(2) of the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), as well as his right to a "full and fair hearing", guaranteed by Section 101(a)(5) of the LMRDA, when they suspended his union membership for a three-year period. DeCarlo asserts that the United Brotherhood of Carpenters and Joiners of America, AFL–CIO ("UBC") is liable as the parent body of Local 85. DeCarlo brings this action pursuant to Sections 101(a)(2), 102 and 609 of the LMRDA, 29 U.S.C. §§ 411(a)(2), 412 and 529. DeCarlo seeks reinstatement, compensatory and punitive damages, and attorneys' fees and costs.

Presently before me are DeCarlo's motion for summary judgment against Local 85, Local 85's cross-motion for summary judgment, UBC's motion to dismiss or for summary judgment, and DeCarlo's cross-motion for summary judgment against UBC. For the reasons stated below, DeCarlo's motion against Local 85 is granted in part and denied in part, Local 85's motion is granted in part and denied in part, UBC's motion is granted and DeCarlo's motion against UBC is denied.

## BACKGROUND

This case is about union officials' apparently well intended but sometimes misdirected attempts to discipline a union member who was an outspoken and persistent critic of certain union officials. In August 1993 defendant Frank Salamone, then president of Local 85, issued a letter to all union members formally charging DeCarlo with violating the Union's constitution. The charges were based upon statements made by DeCarlo in three letters: an April 1993 letter to retired union members ("retirees"), a May 1993 letter to the General President of the UBC, and a June 1993 letter to union retirees. According to defendants, DeCarlo made several false allegations in these letters, including charges that certain members were not paying dues, that the election committee was acting improperly, and that the retirement fund trustees were conspiring to hold down benefit increases. Additionally, the June letter contained an offer by DeCarlo to pay $20 to all retirees who voted in the upcoming union election, so long as the retirees signed up at a table staffed by DeCarlo, and so long as the state supported by DeCarlo won the election. According to DeCarlo, the $20 offer was "made to defray your transportation cost to and from the voting place" and "may also buy your lunch." Apparently after objections were raised, DeCarlo retracted the $20 offer in a follow-up letter dated the same day as the original letter containing the offer.

DeCarlo was charged with violating Section 55 A(1) of the constitution ("Causing dissension among [union] members"); Section 55 A(5) ("Willful slander or libel of an officer or member"); and Section 55 A(13) ("Violating the Obligation" by which union members pledge their word and honor).

Pursuant to the Union's constitution, a trial on the charges was conducted and a trial committee, comprised of non-interested union members, was selected to hear the charges. Defendant Salamone, as President of Local 85, presented the charges to the trial committee. DeCarlo, represented by counsel, appeared and defended the charges.

What ensued next can best be described as confused and confusing. The trial was convened, adjourned, and reconvened several times over a four-month period. Nearly every session was marked by contentious comments and accusations by DeCarlo, and evident frustration on the part of the committee. Testimony from several witnesses for the 'prosecution' was taken during the first two sessions. DeCarlo himself cross-examined these witnesses at length. A third session was convened and adjourned without explanation. At the beginning of the fourth

session, the parties were excused and the committee, in "executive session," received testimony from committee member Jonathan Wirt, who testified that DeCarlo had approached him, shortly after Wirt was selected to serve on the trial committee, and offered him $1,000 if he would not "show up to the hearing."

The committee sought legal advice from attorney E. Joseph Giroux, Jr., concerning this allegation. Giroux's letter to the committee, recommending that it declare a mistrial because the alleged bribe might be perceived as making the committee biased, was read into the record.[1] The hearing then was recessed.

At the next session, one month later, Wirt resigned from the committee citing the alleged bribe and his inability to be impartial. However, no mistrial was declared.

One month later the hearing was again convened. DeCarlo was given the opportunity to present his case. He presented no proof, but instead spoke emphatically and at length about the bias of the committee and numerous alleged procedural defects at the hearing. He concluded his remarks by asserting that Salamone had failed to prove his case and he requested that the committee dismiss the charges. Following DeCarlo's lengthy testimony, the committee recessed and when it returned the committee chairman declared "we feel that since the accused feels that we are very biased in this case, we are calling for a mistrial ..." Transcript of Proceedings, April 25, 1994, at p. 26.

Following the "mistrial," the hearing transcripts were forwarded by the trial committee to Local 85's Executive Committee which, after deliberation, recommended that the charges relating to slander and dissension be dropped, but that DeCarlo be punished for making the $20 offer to the union's retirees.

The recommendation was put to the union members, and they voted overwhelmingly to approve the Executive Committee recommendation. Accordingly, DeCarlo was given

a three-year suspension for making the $20 offer. The other charges were dismissed.

DeCarlo appealed the suspension to the UBC which affirmed the Local's determinations. Noting that "the course of events in this case makes a regrettable demonstration of how easy it can be to undermine and disrupt the internal union proceedings designed to help 'lay persons' render membership discipline...." the UBC Appeal's Committee upheld the actions of the Local 85 officials and stated that "the unfortunate course of events and procedural complications in this case should not deprive the Local Union membership of a meaningful remedy for the evident violation committed by Brother DeCarlo." Appeals Committee Determination, June 22, 1995.

DeCarlo commenced this action April 1996.

## THE PRESENT MOTIONS

All parties seek summary judgment. Pursuant to Fed.R.Civ.P. 56(c), a moving party is entitled to a judgment as a matter of law if there is "no genuine issue as to any material fact" and where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. "[T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356 (quoting Fed. R.Civ.P. 56(e) (alteration in original)).

### A) *DeCarlo and Local 85's Cross Motions for Summary Judgment*

DeCarlo seeks summary judgment on his claim that Local 85 and the individual defen-

---

1. Although the reasons for this are unclear, DeCarlo was never "charged" with making this

alleged bribe.

dants (the "Local 85 defendants") violated LMRDA Section 101(a)(2)[2] by prosecuting the charges of slander and libel, even though ultimately they were dismissed. He asserts that the charges were "maliciously instituted ... as a reprisal against [him]" for his support of dissident candidates and his criticism of union officials. Complaint at ¶ 8.

He also seeks summary judgment on his claim that these defendants failed to provide him with a "full and fair" hearing, as required by LMRDA Section 101(a)(5)[3], because he was never permitted to present his defense, and because the hearing was fraught with procedural errors. DeCarlo claimed that the hearing was aborted before he completed his defense.

The Local 85 defendants oppose and cross-move for summary judgment on both claims, asserting that because DeCarlo was not disciplined for the defamation charges, no claim under Section 101(a)(2) can be sustained. The Local 85 defendants also assert that this Court owes considerable deference to the Local's determinations and that it is clear from the record that DeCarlo had ample opportunity to defend himself during the lengthy hearing and, therefore, he received a "full and fair" hearing in accordance with Section 101(a)(5).

### 1) *Section 101(a)(2)*

Section 101(a)(2) of the LMRDA provides in relevant part that "every member ... shall have the right to ... express any views, arguments, or opinions." This language has been interpreted liberally: for over three decades Second Circuit precedent has established that the LMRDA protects union members' rights to freely express their opinions about union matters, even where that expression amounts to libel or slander.

**2.** LMRDA Section 101(a)(2) states in relevant part that "[e]very member of any labor organization shall have the right to ... express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting ... Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refrain-

In *Salzhandler v. Caputo,* 316 F.2d 445 (2d Cir.1963), the plaintiff had accused the union president of improper conduct regarding union funds. He was charged with libel and slander, tried and found guilty by a union tribunal and, *inter alia,* suspended from participating in union affairs for five years. The Second Circuit reversed the actions of the union, finding that the plaintiff's statements were protected by the LMRDA and, thus, the union's actions were unlawful.

Citing both the free speech provisions of Section 101(a)(2) and the language of Section 609, 29 U.S.C. § 529, which holds that a union may not "fine, suspend, expel, or otherwise discipline" a member for "exercising any right to which he is entitled under the provisions of 'the Act' ....", the Court stated that "[f]reedom of expression would be stifled if those in power could claim that any charges against them were libelous and then proceed to discipline those responsible on a finding that the charges were false.... It follows that although libelous statements may be made the basis of civil suit between those concerned, the union may not subject a member to any disciplinary action on a finding by its governing board that such statements are libelous." *Salzhandler,* 316 F.2d at 451.

The broad protections provided by the LMRDA were reiterated in *Petramale v. Local 17, Laborers Int'l Union,* 736 F.2d 13 (2d Cir.1984), where the Second Circuit held that "criticism of union officers, even when it amounts to slander, is protected speech under the LMRDA." *Id.* at 16. In that case, the plaintiff had been charged, found guilty, and suspended for acts of disruption which were "inextricably merged" with "accusations of slander." Again analyzing Section 101(a)(2) in conjunction with Section 609, the

ing from conduct that would interfere with its performance of its legal or contractual obligations." 29 U.S.C. § 411(a)(2).

**3.** LMRDA Section 101(a)(5) states in relevant part that "[n]o member of any labor organization may be ... disciplined ... by such organization ... unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." 29 U.S.C. § 411(a)(5).

Court found that "these provisions ... prohibit unions from disciplining a member for even libelous statements in union meetings criticizing the performance of union officers." *Id.* at 17. Thus, it held that when "discipline is imposed on the basis of a combination of factual allegations an essential element of which is protected speech, the discipline as a whole is invalid ..." *Id.* at 16. *See also Rodonich v. House Wreckers Union Local 95*, 817 F.2d 967, 975 (2d Cir.1987) ("There is no question that discipline of a union member for even libelous speech is a violation of the LMRDA").

■ Thus, in 1993 (the time period relevant to this case) it was well established that the LMRDA protects union members' free speech and that disciplining a union member for even libelous or slanderous speech is prohibited.[4]

The Local 85 defendants seek to escape liability on the grounds that DeCarlo was never "disciplined" for his speech because the charges relating to libel and slander were dismissed. Defendants seem to contend that some type of formal discipline is a prerequisite to maintaining an action for a violation of § 101(a)(2) of the LMRDA.

I disagree. I believe that these defendants focus too narrowly on the issue of "discipline," thus exalting form over substance. The intent of Second Circuit precedent since 1963 is clear: speech by union members, related to union matters, even if libelous, is protected by the LMRDA.[5] It is disingenuous to suggest that by dismissing libel and slander charges after a full trial but prior to conviction, a union somehow avoids violating Section 101(a)(2) because the defen-

dant in such a prosecution is never formally "disciplined." In my opinion, such an interpretation would permit significant abuses aimed at stifling dissent, so long as no formal conviction were obtained or punishment imposed. This would pervert the intent of the Act and is contrary to the case law interpreting it.

■ The law is clear that whether DeCarlo was disciplined is not necessary to establish a cause of action under Section 101(a)(2). As noted, Section 101(a)(2) protects union members' rights to "express any views, arguments, or opinions." Section 102 creates a federal cause of action for the alleged infringement of the rights protected in Section 101. *See* 29 U.S.C. § 412 ("[a]ny person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States ..."). Neither provision refers to the union member's being disciplined as a necessary prerequisite for a cause of action. Thus, a cause of action brought pursuant to Section 102, for violating Section 101(a)(2), does not depend upon whether discipline, as set forth in Section 609, has occurred. *See Finnegan v. Leu*, 456 U.S. 431, 439, 102 S.Ct. 1867, 1872, 72 L.Ed.2d 239 (1982) ("it seems evident that a litigant may maintain an action under § 102—to redress an 'infringement' of 'rights secured' under Title I—without necessarily stating a violation of § 609."); *Cotter v. Owens*, 753 F.2d 223, 226 (2d Cir.1985) ("Section 609 bars 'discipline' of a union member for exercising rights guaranteed by the Act. Section 102 provides independent authorization

---

4. This policy remains unchanged. *See Schermerhorn v. Local 100 Transport Workers Union*, 91 F.3d 316, 324 (2d Cir.1996) (noting that unions may not discipline a member "for statements made at union meetings which criticize the performance of union officers, even if such statements are libelous."); *see also Georgopoulos v. Int'l Brotherhood of Teamsters*, 942 F.Supp. 883 (S.D.N.Y.1996) ("[u]nder LMRDA Section 101(a)(2), ... imposing discipline on a union member for criticizing union officials, even when the criticism amounts to slander, violates the LMRDA"), *aff'd*, 116 F.3d 1472 (2d Cir.1997).

5. The statute contemplates possible exceptions to the scope of protected speech. It permits a un-

ion to establish reasonable rules concerning "the responsibility of every member toward the organization as an institution" and "refraining from conduct that would interfere with" the union's legal and contractual obligations. LMRDA Section 101(a)(2). Defendants are silent regarding these exceptions and I find neither is relevant to this litigation: there are no rules or regulations governing conduct at issue and no evidence of conduct effecting union contracts or obligations. Indeed, the speech at issue here—which questioned the manner in which a variety of union affairs and funds were being handled—is the very type of speech that the statute was intended to protect. *See Salzhandler, supra*, at 450–451.

for challenging a Title I violation."); *Guidry v. Int'l Union of Operating Engineers, Local 406*, 907 F.2d 1491, 1493 (5th Cir.1990) ("A litigant may successfully seek redress under section 102 for an infringement of these LMRDA rights [right to free speech under section 101(a)(2) ] even if no unlawful 'discipline' is shown."); *Brenner v. Local 514, United Bhd. of Carpenters*, 927 F.2d 1283, 1298 (3d Cir.1991) (same); *Cehaich v. Int'l Union, UAW*, 710 F.2d 234, 238 (6th Cir. 1983) ("a cause of action may be maintained under section 102 quite apart from the cause of action under section 609"); *Estenich v. Heenan*, 878 F.Supp. 43, 46 (E.D.Pa.1995) (recognizing a distinction between actions brought pursuant to LMRDA § 609, which requires a showing of unlawful 'discipline' and actions brought pursuant to LMRDA § 102, which requires a showing that protected rights were 'infringed').[6]

In this case, in a letter that was sent to all union members, DeCarlo was charged with making numerous slanderous statements. These charges were the predominant subject of a lengthy and protracted hearing that was conducted on five separate sessions over five months. That these charges ultimately were dismissed does not eliminate the fact that DeCarlo may have suffered humiliation and degradation associated with the charges, as well as anxiety over possible punishment, for nearly a full year. Such experiences surely are antithetical to a policy that purports to ensure freedom to express "any views, arguments or opinions."

■ Although a plaintiff need not show that the defendants acted with an improper motive or had a specific intent to quash his speech in order to prevail on a claim under § 101(a)(2), such proof often can be easily inferred.

■ In this case, DeCarlo alleged in his complaint that the charges were brought against him as reprisal for his political opposition and criticism of the union leaders. This aspect of the case is not the basis for DeCarlo's summary judgment motion and, therefore, is not directly addressed by defen-

dants. It is evident that acting in retaliation for political opposition is unlawful under the LMRDA. *See Guidry*, 907 F.2d at 1493 (manipulation of hiring hall procedures to suppress political opposition violates Section 101(a)(2)); *Estenich*, 878 F.Supp. at *46 (job dismissal in retaliation for political dissidence violates Section 101(a)(2)). I need not resolve whether defendants had a hidden agenda in bringing the charges to retaliate against DeCarlo for his political views. There is no dispute in this case that the Local 85 defendants purposely prosecuted DeCarlo on the slander charges for the obvious reason that DeCarlo's statements offended and angered them. This clearly violates the LMRDA.

■ Thus, I find that the Local 85 defendants violated DeCarlo's free speech rights under Section 101(a)(2) by charging and prosecuting him for slander and libel, despite the fact that the charges ultimately were dismissed. *See Murray v. Laborers Union Local 324*, 55 F.3d 1445 (9th Cir.1995) (attempts to confiscate newsletters, papers and other items, as part of scheme to suppress, might violate member's free speech rights under § 101(a)(2)), *cert. denied*, — U.S. ——, 116 S.Ct. 1847, 134 L.Ed.2d 948 (1996); *Mallick v. Int'l Bhd. of Elec. Workers*, 644 F.2d 228 (3d Cir.1981) ("Harm to free speech rights . . . is not measured solely in economic terms, nor must concrete punishment be meted out to confer standing to sue. The right to speak one's views freely is so fundamental that the specter of punishment, or the uncertainty created by vaguely worded prohibition of speech, is injurious as well").

### 2) *Section 101(a)(5)*

Section 101(a)(5) provides in relevant part that no union member may be disciplined for a charge unless such member has been, *inter alia*, "afforded a full and fair hearing." DeCarlo asserts that he was denied a full and fair hearing due to numerous procedural errors (particularly the mistrial and the result-

---

**6.** DeCarlo brings this action pursuant to both Sections 102 and 609 without specifying the applicability of either provision. Because jurisdic-

tion is based at least in part on Section 102, I find that DeCarlo is entitled to the benefit of this distinction.

ing inability to present his case), and the bias of the committee.

█ LMRDA Section 101(a)(5) was not intended by Congress to constitute an invitation to the courts to intervene at will in the affairs of unions ... but rather to "guard against abusive and unjust exercises of union authority by prohibiting a union from disciplining a member without first affording him certain procedural safeguards against unwarranted or inaccurate adjudication." *Georgopoulos v. Int'l Bhd. of Teamsters*, 942 F.Supp. 883, 894–895 (S.D.N.Y.1996) (citing *Rosario*). Thus, Congress has imposed only "a handful of basic procedural components", and "courts are not to intrude upon internal union disciplinary actions except to uphold these minimum standards." *Georgopoulos*, 942 F.Supp. at 895.

█ A union member is entitled to "an impartial trial body which arrives at its decision on the basis of evidence that the accused has an opportunity to rebut." *Id.* (citing *Berg v. Watson*, 1977 WL 1728 (S.D.N.Y. 1977)). The accused must be given " 'adequate notice and a reasonable opportunity to defend, including the right to confront an accuser, to present evidence and to cross-examine witnesses.' " *Id.* (citations omitted). However, the burden of proof is low—only "some evidence" is necessary to support union charges, and the "full panoply of procedural safeguards found in [judicial] proceedings are not required." *Id.* (citing *Int'l Bhd. of Boilermakers v. Hardeman*, 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971) and *United States v. Int'l Bhd. of Teamsters*, 964 F.2d 1308 (2d Cir.1992)).

█ Importantly, "a union's reasonable interpretation of the scope of offenses for which it may discipline its members is entitled to deference." *Id.* (citing *Int'l Bhd. of Boilermakers*, 401 U.S. at 244–45, 91 S.Ct. at 616–17). It is not the court's job to construe union rules "in order to determine whether particular conduct falls within or without their scope," or "to scrutinize the union regulations in order to determine whether particular conduct may be punished at all." *Int'l Bhd. of Boilermakers*, 401 U.S. at 244–45, 91 S.Ct. at 616.

█ Moreover, even where a union fails to follow its own procedural rules, there is no LMRDA violation unless the shortcoming also "contravenes specific prohibitions in the LMRDA." *Wellman v. Int'l Union of Operating Eng'rs*, 812 F.2d 1204, 1206 (9th Cir.1987) (citing *Int'l Bhd. of Boilermakers*, 401 U.S. at 242–43, 91 S.Ct. at 615–16). "The LMRDA does not allow the recovery of damages for a union's violation of a technical internal rule that does not adversely affect a member's due process rights." *Id.* at 1206 (citing *Curtis v. Int'l Alliance of Theatrical Stage Employees Local No. 125*, 687 F.2d 1024, 1029–30 (7th Cir.1982)). Thus, DeCarlo's claims that the hearing was marked by procedural shortcomings cannot sustain a claim for damages under the LMRDA unless the shortcomings also impacted identifiable rights under that Act.

█ In this case, Local 85's constitution sets forth the following "trial procedures": a trial committee was to evaluate the evidence heard during trial, make a determination as to guilt or innocence, and "submit a full report of the case with their verdict in writing to the Local Union...." Constitution Section 56 K. The union membership then must vote "to affix such legal penalty as they deem proper." Constitution Section 56 L. In this case, instead of following these procedures, the trial committee declared a mistrial, turned the transcripts over to the Executive Committee, and then the Executive Committee reported to the union membership, which voted on and approved the penalty of suspension.

The parties disagree as to what happened when the case was turned over to DeCarlo for his defense. Defendants contend that DeCarlo waived his opportunity to present any proof because when given the opportunity to do so, he declined and instead argued to the committee that the case should be dismissed. They also contend that DeCarlo established his position and his defense through his extensive cross-examination of the witnesses presented by Salamone. Although DeCarlo now asserts that he wanted to introduce additional evidence about the effect of the $20 offer and whether the offer

violated the constitution, the record does not support his claim that he made that request at the time of the hearing.

In any event, because only one charge was sustained—the $20 offer—the alleged deficiencies in the hearing did not deprive De-Carlo of a fair hearing on that charge. In the circumstances of this case, the hearing on the charge that was sustained was more than adequate. Most of the testimony and argument during the hearing focussed on the slander and libel charges that ultimately were dismissed. DeCarlo was not suspended for any of those matters. The only basis for DeCarlo's suspension was the $20 offer to voting retirees, an act that DeCarlo did not and does not deny. Thus, the effect of the mistrial and the alleged inability to present his own case is less significant in this case than if DeCarlo had been suspended for actions that were the subject of conflicting factual allegations at the trial.

DeCarlo did have the opportunity to cross-examine each of the prosecution witnesses and did so at length. In fact, the record shows that DeCarlo's cross-examination dominated the trial. Out of 267 pages of trial testimony, involving only five witnesses, DeCarlo's examination of those commenting on the charges against him as well as the trial proceedings generally, in a speech that encompassed nearly twenty five pages of transcript. Both DeCarlo's examination of witnesses as well as his statement to the committee included a discussion of the $20 offer to voting retirees. DeCarlo cross examined one witness for nearly ten pages about the legal effect of the $20 offer and its distinction from other voting activities considered lawful (such as offering rides to the polls). Both the original "offer letter" as well as the letter of retraction were submitted into evidence.

It is also important to note that DeCarlo never contested the fact that he made the $20 offer to those union retirees who were eligible to vote at the union election. DeCarlo contested only the legal effect of that act. He attempted to explain his actions and convince the union that it did not constitute impermissible conduct. He also emphasized the admitted fact that he retracted the offer the same day. In other words, there was very little to dispute concerning the charge for which DeCarlo was convicted. DeCarlo's real dispute now is that the union interpreted his actions contrary to what DeCarlo believes should be the case.

It is for the union to decide and interpret the evidence as to whether its union rules had been violated. Thus, the Executive Committee reviewed the transcripts, deliberated, and made its recommendation for suspension based upon the undisputed facts that DeCarlo made the $20 offer. The committee acknowledged that DeCarlo withdrew the offer the same day he made it, but decided nonetheless to recommend suspension. The record reflects that these acts were taken deliberately and with great care in order to proceed in an unbiased manner in the context of a most difficult and unusual situation. This punishment was overwhelmingly approved by the membership at large. Thus, even though the trial committee did not reach this determination, as contemplated by the Union constitution, I find that the ultimate determination was made by a fair tribunal, based upon uncontested facts.

In *Wellman, supra,* the plaintiff claimed that he was denied a full and fair hearing because he was tried before a "regular membership meeting" rather than a "general membership meeting." The Circuit rejected his claim that this procedural foible violated his rights under the LMRDA: "The fact that Wellman was tried at one type of membership meeting instead of another did not deprive him of a fair hearing." *Id.* at 1206. I find the facts of this case quite similar to those in *Wellman.* Although some of the Local's internal procedures were not followed, DeCarlo's rights under the LMRDA were not violated because the ultimate determination was made by a fair tribunal, after careful review of the facts, based upon an uncontested act. *See Ritz v. O'Donnell,* 566 F.2d 731, 736 (D.C.Cir.1977) (where the entire case against the union member was proven by written documents the authenticity of which he did not deny, there were "no witnesses for him to cross-examine" and no need to present "some kind of affirmative defense"). As noted above, unions have great

discretion in determining the scope of punishable activities, as well as determining the scope of punishment. *See Georgopoulos, supra.* Because I am satisfied that DeCarlo was treated fairly and suspended only for an act that he admits doing, I am unable to find that his rights under LMRDA Section 101(a)(5) were violated. DeCarlo's suspension is not unlawful.

Finally, despite DeCarlo's strenuous assertions that the trial committee was biased, I find such assertions insufficient to defeat defendants' motion for summary judgment because there is no other evidence to support such claims. To the contrary, the record reflects that the trial committee worked hard to avoid any appearance of impropriety, in circumstances that clearly were difficult. Similarly, the record reflects that the executive committee took steps to insure that its actions were not perceived to be biased in any way. Its determination was made only after those members who were interested or involved in the case in any way were excused. This evidence is not overcome by DeCarlo's unsupported allegations of bias. Accordingly, I find that the Local 85 defendants did not violate DeCarlo's rights under Section 101(a)(5).

In sum, with respect to DeCarlo and the Local 85 defendants' cross motions for summary judgment I find as follows: on DeCarlo's claim that the Local 85 defendants violated LMRDA Section 101(a)(2), DeCarlo's motion is granted and the Local 85 defendants' motion is denied; on DeCarlo's claim that the Local 85 defendants violated LMRDA Section 101(a)(5), DeCarlo's motion is denied and the Local 85 defendants' motion is granted.

### B) *UBC and DeCarlo's Cross–Motions*

The UBC moves for summary judgment on the grounds that, as a matter of law, it did not ratify any unlawful actions of the Local and therefor has no liability. DeCarlo cross-moves, asserting that the UBC was involved in Local 85's unlawful activities and therefor is liable. UBC's motion is granted and the case against it dismissed.

"An international union has no independent duty to intervene in the affairs of its local chapters, even where the international has knowledge of the local's unlawful acts." *Phelan v. Local 305, United Ass'n of Journeymen,* 973 F.2d 1050, 1061 (2d Cir. 1992) (citing *Carbon Fuel Co. v. United Mine Workers,* 444 U.S. 212, 217–18, 100 S.Ct. 410, 414–15, 62 L.Ed.2d 394 (1979)). "Common law agency principles govern an international union's liability for actions of its local chapters or their officers." *Id.* at 1062 (citing *Rodonich,* 817 F.2d at 972–73). Thus, an international may be liable if it 'ratifies' the unlawful acts of a local union, which occurs when an international, "having knowledge of the material facts involved in a transaction, evidences an intention to ratify it." *Id.*

In this case, the UBC reviewed Local 85's actions in its capacity as an appellate tribunal. In its written decision, it "denied" DeCarlo's appeal concerning the $20 offer to voting retirees, finding that "the facts justify a 'directed verdict' of guilty on the allegation of offering money for retiree votes." Additionally, the decision expressly noted that "the charges based on Brother DeCarlo's other election-related letters and protests **should have been dismissed,** as the Executive Committee ultimately recognized." Appeals Committee Determination, June 22, 1995. Thus, the UBC expressly affirmed only that part of Local 85's actions relating to the $20 offer to voting retirees. Because I have determined that the Local 85 defendants did not violate DeCarlo's rights when they suspended him for making the $20 offer, there can be no liability on the part of the UBC for affirming that decision.

Nor did UBC ratify Local 85's unlawful acts relative to Section 101(a)(2). While I have determined that the Local 85 defendants did violate DeCarlo's 'free speech' rights pursuant to Section 101(a)(2), the UBC's written decision did not ratify this unlawful conduct. Indeed, in its written determination the Appeals Committee expressly noted that the slander and libel charges should have been dismissed. These actions by the UBC do not constitute ratification of illegal conduct.

Moreover, by the time the UBC was involved in the matter, the slander and libel charges had already been dismissed. The UBC expressly noted that this was the appropriate result. Because UBC had no duty to intervene—*see Phelan*, 973 F.2d at 1061 ("[a]n international union has no independent duty to intervene in the affairs of its local chapters, even where the international has knowledge of the local's unlawful acts"); *Rodonich*, 817 F.2d at 974 (It "is established law" that an international has "no independent duty to intervene in the affairs of [its local]")—it was not required to undo what already had been corrected. Thus, the UBC is not liable for the Local 85 defendants' unlawful actions.

▆▆▆ DeCarlo alleges that on one occasion the trial committee sought counsel from one Kathy Krieger, who was at the time counsel for the UBC. This involvement, asserts DeCarlo, makes the UBC an active participant in Local 85's actions. I disagree. .

While DeCarlo asserts that Krieger was consulted concerning the allegation that DeCarlo had attempted to bribe trial committee member Jonathan Wirt, DeCarlo offers no explanation concerning Krieger's role who she advised, or in what capacity she was acting.

While the record is not clear concerning Krieger's role, the absence of evidence or explanation indicates that it was minimal. No reference is made to her, or any advice rendered by her, at any place in the trial transcript. (The only attorney mentioned is attorney Geroux, whose letter was read into the record.) There is no evidence or even suggestion that Krieger advised the executive committee or the union membership at large in any way, or that the executive committee or union membership even was aware of or relied upon any advice allegedly rendered by her. Whatever her role may have been it clearly was minimal and was limited to contact with the trial committee only (which made no determinations regarding guilt or punishment), well after Local 85 had brought charges against DeCarlo. Thus, I find that Krieger's alleged role, if any, was insufficient to raise a triable issue concerning UBC's involvement in Local 85's activities.

*See Phelan*, 973 F.2d at 1062 ("[t]he offer or limited provision of legal aid does not alone suffice to show a triable issue as to whether an international union either had full knowledge of and ratified the local's actions or had itself participated in [them]"); *see also Brenner*, 927 F.2d at 1289 ("Mere constructive knowledge of possible illegal activity on the local level is not sufficient to impose a legal duty to intervene on the International Union"); *Chapa v. Local 18*, 737 F.2d 929, 932 (11th Cir.1984) (finding no liability on part of international union where its representatives were present at local meetings but acted only as spectators or on behalf of the local).

I find that UBC is not liable for the unlawful acts of the Local 85 defendants. DeCarlo's motion against the UBC is denied in its entirety and UBC's motion for summary judgment against DeCarlo is granted in its entirety.·

### CONCLUSION

For all the above reasons, I hereby GRANT in part and DENY in part DeCarlo's motion for summary judgment against the Local 85 defendants (# 3); GRANT in part and DENY in part the Local 85 defendants' cross-motion for summary judgment (# 11); GRANT the UBC's motion for summary judgment (# 24); and DENY DeCarlo's cross-motion for summary judgment against the UBC (# 31).

Whether DeCarlo can prove that he suffered something other than nominal damages for the violation of § 101(a)(2) remains to be determined.

Any claimed damages must be causally connected to the suppression of speech claim and not to the suspension imposed because of the $20 offer charge which I have sustained. The damages must be separate and distinct from whatever DeCarlo has incurred relative to the charge that has been sustained. The burden, of course, is on DeCarlo to establish his entitlement to damages.

If the matter cannot be resolved between the parties, then DeCarlo is directed to set forth in an affidavit his claimed damages, both compensatory and special, and the basis

for each item of damage. DeCarlo must also submit legal authority supporting such relief.

Thereafter, the Local 85 defendants must respond. The Court will then determine whether the issue can be resolved by the Court on the submitted papers or whether an inquest or hearing concerning damages will be necessary.

DeCarlo's submissions, if any, on damages must be filed with the Court, within fifteen (15) days of entry of this Decision and Order and the Local 85 defendants' response must be filed within fifteen (15) days of receipt of DeCarlo's submission.

IT IS SO ORDERED.